# Supreme Court of Florida

_____

No. SC11-2083
_____

**GARY RICHARD WHITTON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC12-2522
_____

**GARY RICHARD WHITTON,**
Petitioner,

vs.

**MICHAEL D. CREWS, etc.,**
Respondent.

[October 9, 2014]

PER CURIAM.

Gary Richard Whitton appeals an order of the circuit court denying his

motion to vacate his conviction of first-degree murder and sentence of death filed

under Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ

of habeas corpus.  We have jurisdiction.  See art. V, § 3(b)(1), (9), Fla. Const.

**FACTS**

Whitton was convicted for the 1990 murder of James Mauldin.  On direct

appeal, this Court summarized the events leading to Mauldin's murder, and

Whitton's subsequent arrest and conviction as follows:

> The evidence presented at trial revealed that Whitton and James
> S. Mauldin met each other in March 1989, while receiving alcohol
> treatment at a halfway house in Pensacola.  After leaving the halfway
> house, they continued to see each other at occasional Alcoholics
> Anonymous meetings.  On October 6, 1990, Mauldin arrived at
> Whitton's Pensacola home in a taxicab.  Whitton then gave Mauldin a
> ride to the halfway house where they originally met.  On Sunday
> October 7, an intoxicated Mauldin returned to Whitton's home.  He
> stayed with Whitton that day, as well as Monday, October 8.
> On October 8, Whitton drove Mauldin to a bank in Destin so
> Mauldin could withdraw some money.  The two men went to
> Mauldin's bank in Destin rather than a bank in Pensacola because
> Mauldin had lost his passbook and he believed he needed it to
> withdraw money from a bank other than his own.  Mauldin's bank
> was closed when the two men arrived, but they returned to the bank
> on October 9.  Upon their arrival, a teller told Mauldin he could not
> make a withdrawal without his passbook.  Upset by this information,
> Mauldin closed his account and obtained $1135.88 in cash.  Whitton
> assisted Mauldin in completing the transaction because Maudlin, who
> was apparently intoxicated, was unable to complete it himself.
> Whitton then took Mauldin to a motel in Destin at Mauldin's
> request.  Whitton completed the motel registration forms due to
> Mauldin's intoxication, but provided the motel clerk with false
> information about his own vehicle's license plate number.  The motel
> clerk noticed the discrepancy and put Whitton's correct license plate
> number on the form.  Whitton then assisted Mauldin to his room and
> left the motel sometime before noon.

Whitton originally told investigators that he did not revisit Mauldin that night. He later admitted returning to the motel and stated that he did so to tell Mauldin his mother was looking for him. Whitton claimed Mauldin was dead when he arrived and that he remained in the room for only a few moments. The motel clerk, however, testified that he saw Whitton's car arrive at approximately 10:30 p.m. that night and leave at around 12:30 a.m.

The same motel clerk discovered Mauldin's body the next day. An officer called to the scene testified that Mauldin's pockets had been turned inside out and that no money, other than a few coins, remained in the room. The officer testified that the blood found throughout the room made it appear as though a struggle had taken place. Blood spatter evidence confirmed the officer's conclusion. An expert in bloodstain analysis testified that the initial bloodshed began on the south bed, then continued to the foot of that bed, then to the floor between the beds, and finally ended between the north bed and north wall.

An autopsy revealed that Mauldin sustained numerous injuries during the attack which caused his death. Mauldin's skull was fractured and he suffered stab wounds to his shoulder, cheek, neck, scalp, and back. In addition, Mauldin sustained three fatal stab wounds to the heart. The medical examiner testified that these wounds prevented Mauldin's heart from beating properly and, consequently, caused his death. The medical examiner also testified that Mauldin had wounds to his arms and hands consistent with his attempting to defend himself. Accordingly, the medical examiner concluded that Mauldin was conscious during the attack, although a blood alcohol test indicated Mauldin's blood alcohol level was .34 at the time of death.

The correct license plate number ascertained by the alert motel clerk led the police to Whitton's home. At approximately 1:30 a.m. on October 11, several officers knocked on Whitton's door after observing his car parked outside the house. Whitton invited the officers inside. Although the officers explained that Whitton was not under arrest and that he was not required to answer their questions, Whitton agreed to talk with them. After about twenty minutes, during which Whitton changed from his night clothes, he also agreed to accompany the officers to the police station. At the police station, several officers continued questioning Whitton regarding Mauldin's death until he invoked his right to remain silent.

A subsequent search of Whitton's home revealed a pair of boots stained with blood matching Mauldin's blood type. A search of his car revealed blood stains matching Mauldin's blood type, as well as receipts indicating that Whitton paid several overdue bills on October 10. In addition, a receipt indicating that Whitton obtained a car wash on October 10 at 2:37 a.m. was found in his car. Consequently, Whitton was charged with first-degree murder and robbery.

While incarcerated and awaiting trial, Whitton confessed to another inmate that he went back to the motel the night Mauldin was murdered to get the money Mauldin had withdrawn from the bank, that a fight ensued, and that he stabbed and killed Mauldin. Whitton told the inmate he had to commit the murder in order to prevent Mauldin from testifying against him in any parole violation proceeding that might occur as a result of the robbery. This confession was overheard by a third inmate and both inmates testified at Whitton's murder trial. A jury found Whitton guilty of murder and robbery.

In the penalty-phase proceeding the jury unanimously recommended the death sentence. The trial judge followed the jury's recommendation and sentenced Whitton to death for the murder conviction and to a consecutive nine-year sentence for the robbery conviction. In support of the death penalty the judge found five aggravating factors: (1) Whitton committed the crime while on parole for a 1981 armed robbery conviction; (2) Whitton was previously convicted of another felony involving the use or threat of violence; (3) the crime was committed to avoid arrest; (4) the crime was committed for pecuniary gain; and (5) the crime was heinous, atrocious, or cruel. The judge also found a number of nonstatutory mitigating factors [:(1) Whitton suffered a deprived childhood and poor upbringing; (2) Whitton was abused as a child; (3) Whitton was abused by his two alcoholic parents; (4) Whitton was a hard worker when employed; (5) Whitton had shown potential for rehabilitation; (6) Whitton had performed various humanitarian deeds; (7) Whitton was an alcoholic; (8) Whitton had an unstable personality consistent with alcoholism and child abuse; (9) Whitton is a human being and child of God,] but determined they did not outweigh the aggravating factors.

Whitton v. State, 649 So. 2d 861, 862-64 (Fla. 1994) (footnotes omitted).

Whitton raised seven issues on appeal.[1]  This Court did not grant relief on any of Whitton's claims and affirmed his convictions and sentences.  Id. at 867.

On March 26, 1997, Whitton filed a shell motion for postconviction relief pursuant to rule 3.850.  Whitton subsequently filed three amendments to his motion; the third and last was filed on November 1, 2004.  Whitton raised twenty-nine claims.  The court summarily denied eleven claims and conducted an evidentiary hearing on the remaining eighteen claims.  After the evidentiary hearings held on October 31 through November 3, 2005, the court denied each of Whitton's remaining claims in a 102-page order issued on June 2, 2011.

Whitton appeals the denial of five claims, and has filed a petition for a writ of habeas corpus, raising two additional claims.  Because we find that Whitton has failed to establish that he is entitled to relief on any of his claims, we affirm the postconviction court's denial and deny Whitton's petition for a writ of habeas corpus.

_____

1.  (1) The trial court erred in denying Whitton's motion for mistrial after the prosecutor commented on his post-arrest silence during closing argument; (2) the trial court erred in denying in part Whitton's motion to suppress statements he made to officers because the statements were allegedly the product of an illegal arrest; (3) the heinous, atrocious, or cruel instruction provided by the court was unconstitutionally vague; (4) the trial court erred in finding that the murder was especially heinous, atrocious, or cruel; (5) the trial court erred in failing to give a limiting instruction with respect to the avoiding arrest circumstance; (6) the trial court erred in finding that the murder was committed to avoid arrest; and (7) the death sentence is not proportionate in this case.

## DISCUSSION

## **<u>Brady</u> and <u>Giglio</u>**

In his first issue on appeal, Whitton raises several claims purported to be violations of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  Whitton's claims appear to be a mixture of <u>Brady</u>, <u>Giglio v. United States</u>, 405 U.S. 150 (1972), and improper argument claims.  The theme of Whitton's claims is that, overall, the prosecution was corrupt and sought to convict him by any necessary means.  In each of these claims, Whitton fails to establish each of the prongs necessary to maintain a claim.  Accordingly, we find that the postconviction court properly denied these claims.

## **Standards of Review**

To successfully raise a <u>Brady</u> violation claim, Whitton must show that: (1) the evidence was favorable to him, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the State; and (3) that the suppression resulted in prejudice.  <u>Conahan v. State</u>, 118 So. 3d 718, 729 (Fla. 2013) (citing <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999); <u>Johnson v. State</u>, 921 So. 2d 490, 507 (Fla. 2005); <u>Rogers v. State</u>, 782 So. 2d 373, 378 (Fla. 2001)).  "To establish the materiality element of <u>Brady</u>, the defendant must demonstrate a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  <u>Conahan</u>, 118 So. 3d at 730 (quoting <u>Guzman v. State</u>, 868 So. 2d 498, 506 (Fla. 2003)) (internal quotation

marks omitted). The review of a postconviction court's denial of this claim is under a mixed standard where this Court defers to the lower court's factual findings that are supported by competent, substantial evidence and reviews the application of law de novo. Id. at 730 (quoting Sochor v. State, 883 So. 2d 766, 785 (Fla. 2004)).

Likewise, there are three elements to a successful Giglio claim, Whitton must demonstrate that (1) the testimony was false; (2) the prosecutor knew it was false; and (3) the testimony was material. See Conahan, 118 So. 3d at 728 (citing Guzman, 868 So. 2d at 505). If Whitton successfully demonstrates the first two elements, "the State bears the burden of proving that the testimony was not material by showing that there is no reasonable possibility that it could have affected the verdict because it was harmless beyond a reasonable doubt." Id. at 728-29 (citing Johnson v. State, 44 So. 3d 51, 64-65 (Fla. 2010); Guzman, 868 So. 2d at 506-07). And, the claim carries the same mixed standard of review. Id. at 729 (citing Suggs v. State, 923 So. 2d 419, 426 (Fla. 2005)).

**Kenneth McCollough**

Whitton's claims regarding McCollough are that: (1) the State coerced him into providing false testimony at Whitton's trial, and (2) the State suppressed knowledge of McCollough's crimes and relationship with the prosecutor's mother, Inez Adkinson. Whitton fails to establish that McCollough presented false

testimony at his trial or that the State was aware that any testimony was false. Second, the record refutes Whitton's assertion that the State suppressed knowledge of McCollough's relationship with Mrs. Adkinson because trial counsel impeached McCollough on the basis of this knowledge.

Whitton's Giglio claim is that the State knowingly presented McCollough's false testimony at trial. McCollough testified at trial that Whitton had confessed to him that he killed Maudlin. Because McCollough's testimony concerned Whitton's confession, this evidence is clearly material. See Shellito v. State, 121 So. 3d 445, 460 (Fla. 2013) ("False evidence is material 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " (quoting Guzman, 868 So. 2d at 506)). However, Whitton has not demonstrated with certainty that the testimony McCollough provided was false, nor that the State knew it to be false.

At the evidentiary hearing, witnesses testified generally about McCollough's reputation as a known snitch and liar. However, no witness provided admissible evidence that McCollough lied specifically about Whitton's confession. Billy Key testified that McCollough intended to recant his trial testimony. George Broxon testified that he knew McCollough had committed a sexually deviant crime that he wanted to cover up. Broxon did not testify that he had specific knowledge that McCollough had lied at Whitton's trial in order to secure a deal with the

prosecution. Whitton also introduced the testimony of Sheila Lowe (formerly McCollough), stating that McCollough was a liar and that she would not believe anything he said. She did not testify specifically about Whitton's case or that she had any specific knowledge that McCollough had lied during his testimony at Whitton's trial. Whitton also produced a transcript of Lowe's police interview describing the nature of McCollough's crimes. Additionally, McCollough never executed an affidavit prior to his death. It seems that the only evidence that McCollough may have wanted to recant his trial testimony was hearsay evidence presented by a third party. Accordingly, the postconviction court's ruling that Whitton failed to demonstrate that a Giglio violation occurred is supported by competent, substantial evidence.

Next, Whitton alleges that the State suppressed knowledge of McCollough's relationship with the prosecutor's mother in violation of Brady. This claim is procedurally barred and refuted by the record. Whitton failed to raise this claim as a Brady violation in his motion for postconviction relief and, therefore, the postconviction court did not address it. Accordingly, Whitton is procedurally barred from raising this claim here.

**Jake Ozio**

Whitton's claim regarding Ozio is similar to his McCollough claim. Whitton alleges that Ozio recanted his trial testimony that Whitton confessed to

him in prison. However, Whitton failed to present any evidence in support of his claim. Accordingly, the postconviction court properly denied this claim.

First, Whitton has failed to demonstrate that the evidence was false. Ozio refused to testify and Whitton did not seek to have Ozio's affidavit submitted into evidence. Additionally, this Court has stated that recantations are highly unreliable. See Spann v. State, 91 So. 3d 812, 816 (Fla. 2012) (stating that because recanting testimony is so unreliable, a new trial will be granted only when it appears that the witness's testimony changes to such an extent as to render a probable different verdict) (citing Armstrong v. State, 642 So. 2d 730 (Fla. 1994)). The only testimony presented at the evidentiary hearing to support this claim was from Kevin Wallace, Ozio's co-defendant, who never stated that Ozio lied at trial. Wallace testified that Ozio told him that Ozio was the only reason they had gotten out of jail. Furthermore, even if Ozio's trial testimony was false, Whitton has not demonstrated that the State was aware that Ozio intended to present false testimony. Accordingly, the lower court properly denied this claim.

**Shirley Ziegler**

Whitton alleges that the prosecutor and sheriff's office threatened Ziegler and that this deprived him of a fair trial. This is neither a Brady nor Giglio claim because Whitton does not allege that the State either presented false testimony or

suppressed evidence, but rather alleges that the State attempted to suppress evidence or coerce Ziegler into testifying falsely about her laboratory results.

Even if we were to address this claim on the merits, the record demonstrates that defense counsel was aware of the alleged threats during trial. Further, Ziegler testified at the evidentiary hearing that she testified truthfully and did not withhold any information. Accordingly, Whitton's claim is refuted by the record and without merit.

**DNA Samples**

Whitton additionally claims that the blood that Ziegler tested was from a different location than that tested by the State's expert, Lonnie Ginsberg. During his postconviction proceedings, it appears that Whitton argued the opposite—that the State attempted to discredit Ziegler's testimony by stating that she tested a different location than Ginsberg. Because Whitton's claim on appeal is different from his claim below, it is procedurally barred.

**The Other DNA Lab**

Whitton also alleges that the State suppressed its attempt to secure additional DNA testing and an audio-taped conversation between Lt. Mann and Brian Wraxall at the Serological Research Institute. The postconviction court listened to the audiotape and determined that there was no exculpatory evidence contained on it. On the tape, Lt. Mann opines that Ziegler probably performed part of the testing

process incorrectly, which altered the results. Thereafter, the postconviction court found that Whitton's claim was refuted by the record and properly denied this claim.

**Cellmark**

Whitton alleges that the State suppressed the Cellmark report stating that the test results were inconclusive. Alternatively, Whitton argues that the State presented false testimony stating that the Cellmark report concluded that there was insufficient material to test. Whitton has failed to establish either a Brady or Giglio violation because he presented no evidence in support of this claim.

First, Whitton has not demonstrated that this evidence would be exculpatory. Zeigler testified at trial that the blood sample in question did not match that of Whitton or the victim. Further, Whitton admitted that the victim's blood was on his boots because, according to Whitton's version of events, he walked through the victim's blood in his hotel room after he had been murdered. Whitton's admission makes it impossible for him to demonstrate prejudice. Likewise, Whitton has not established that any false evidence was presented at trial. Accordingly, the postconviction court properly denied this claim.

**Car Wash Ticket**

Whitton next alleges that the State presented false testimony regarding a car wash ticket found in Whitton's vehicle. Whitton has not established that the

evidence was false, that the State was aware that it was false, or that he was prejudiced.

The car wash ticket was purchased at 2:37 a.m. at a Conoco gas station on October 10, 1990. Such tickets were given when anyone purchased at least eight gallons of gasoline at that particular service station. A person who purchased regular grade gasoline would get one car wash, but a person who purchased mid- or super-grade gasoline would receive a double car wash. The testimony at trial established that Whitton's ticket was a double wash ticket. Accordingly, Whitton's argument that the ticket's use by Lt. Mann proves that Whitton could not have used the ticket is incorrect. Furthermore, the ticket was not used to demonstrate that Whitton had washed his car to remove evidence. The ticket was presented at trial to establish Whitton's whereabouts during the time of the murder because Whitton alleged that he was at home when Maudlin was murdered. The car wash ticket demonstrates that Whitton was not at home and that he was in the vicinity of the victim's hotel.

Whitton has not established that the State presented false testimony. At the evidentiary hearing, Whitton presented a report written by Lt. Mann who concluded that Whitton did not use the car wash. However, in light of the testimony that Whitton's receipt was valid for a double wash, this evidence is insufficient to establish that the State's argument at trial was improper. Further,

because it was not used to demonstrate that Whitton attempted to wash blood off of his car, Whitton cannot demonstrate that the State knew the evidence to be false. Finally, Whitton cannot demonstrate prejudice.

**Maureen Fitzgerald**

Whitton appears to raise another improper argument claim under the guise of Brady and Giglio. Whitton does not allege that Fitzgerald lied at trial, but that the State improperly argued that Whitton lied to Fitzgerald about Maudlin's whereabouts. To the extent that this represents an improper argument claim, it is procedurally barred because it should have been raised on direct appeal. To the extent that this is a Brady or Giglio argument, the postconviction court properly denied this claim.

Fitzgerald testified at trial that Whitton called her on October 8 or 9, 1990, and told her that Mauldin was staying at a hotel in Destin. She testified that she was uncertain of the name, but that she had likely written it down and thought the name might be "Sun Den." Whitton testified that he did not pay attention to the name of the hotel and was not certain what name he had given to Fitzgerald. She was not certain of the name of the hotel and gave several different names. During closing arguments, the State argued that Whitton had misrepresented the hotel's name to Fitzgerald and gave her a different name than the "Sun and Sand" where Mauldin was actually staying.

Whitton cannot raise an improper argument claim as proper grounds for postconviction relief. Because this claim should have been raised on direct appeal, it is procedurally barred. See Jennings v. State, 123 So. 3d 1101, 1102 (Fla. 2013) (citing Spencer v. State, 842 So. 2d 52, 60 (Fla. 2003)).

To the extent that Whitton is alleging a violation of Giglio, Whitton does not argue and cannot demonstrate that the evidence presented was false, nor that the State knew it to be false. Finally, because Whitton also testified that he was uncertain of the name of the hotel, he cannot establish prejudice. Accordingly, the postconviction court properly denied this claim.

**The "Corrupt" Prosecution**

Here, Whitton argues that the overall corruptness of the prosecution in his trial warrants a reversal. Treating this claim as a claim of cumulative error, Whitton has failed to demonstrate that he is entitled to relief. See Merck v. State, 124 So. 3d 785, 802 (Fla. 2013) (" '[W]here individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail.' ") (quoting Griffin v. State, 866 So. 2d 1, 22 (Fla. 2003)).

**Ineffective Assistance of Trial Counsel**

In his second claim, Whitton alleges multiple instances of ineffective assistance of trial counsel. In addition to reasserting the claims above as ineffective assistance of counsel, Whitton raises novel claims that involve his

assertion that trial counsel failed in multiple respects to establish an alternative theory of the crime by: (1) failing to call an expert to testify that a fingerprint could not have been deposited on the inside of a sandwich bag during manufacturing, (2) failing to call a forensic pathologist to dispute the length of time it took the victim to die, (3) failing to establish a different time of death, (4) failing to establish that the State's theory of motive was not supported, (5) failing to argue that the crime scene was not properly processed, (6) failing to argue that the victim was "looking to get rolled," and (7) failing to impeach John Maleszewski's testimony. Because Whitton has failed to establish deficiency or prejudice for each of these sub claims, his claim of ineffective assistance of counsel in the guilt phase fails.

**Standard of Review**

In accordance with <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), this Court employs the following standard of review:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

<u>Long v. State</u>, 118 So. 3d 798, 805 (Fla. 2013) (quoting <u>Bolin v. State</u>, 41 So. 3d 151, 155 (Fla. 2010)). Additionally,

> There is a strong presumption that trial counsel's performance was not deficient. <u>See</u> <u>Strickland</u>, 466 U.S. at 690. "A fair assessment of attorney performance requires that every effort be made to eliminate

the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). "Judicial scrutiny of counsel's performance must be highly deferential." Id. "[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000). Furthermore, where this Court previously has rejected a substantive claim on the merits, counsel cannot be deemed ineffective for failing to make a meritless argument. Melendez v. State, 612 So. 2d 1366, 1369 (Fla. 1992).

In demonstrating prejudice, the defendant must show a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

Long, 118 So. 2d at 805-06 (parallel citations omitted) (quoting Johnston v. State, 63 So. 3d 730, 737 (Fla. 2011)).

Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo.

Shellito, 121 So. 3d at 451 (citing Mungin v. State, 79 So. 3d 726, 737 (Fla. 2011);

Sochor, 883 So. 2d at 771–72).

**Merits**

In this claim, Whitton raises several instances where he argues that trial counsel was ineffective. For each of the subclaims, Whitton has failed to establish

- 17 -

both prongs of the <u>Strickland</u> test. Accordingly, the postconviction court properly denied his claims.

## Car Wash Ticket

Whitton first alleges that counsel was deficient for failing to introduce Lt. Mann's report at trial, which contained Lt. Mann's opinion that Whitton did not use the car wash. Because Lt. Mann's report would have constituted hearsay evidence, and Whitton did not call Lt. Mann to testify at the evidentiary hearing, Whitton cannot establish that counsel was deficient. Additionally, as discussed above, the jury heard testimony that Whitton's ticket was a "double car wash" ticket, meaning that Lt. Mann's conclusion that Whitton did not use the ticket was based on an erroneous assumption. Accordingly, even if counsel had submitted the report into evidence, Whitton cannot establish that it would have affected the outcome of his trial. Therefore, the postconviction court properly denied relief on this claim.

## Fingerprint on the Sandwich Bag

Whitton argues that counsel was deficient for failing to call an expert witness to testify that a fingerprint could not have been deposited inside the sandwich bag during the manufacturing process. The postconviction court properly denied this claim because Whitton cannot establish prejudice or deficiency.

At trial Florida Department of Law Enforcement agent Tom Simmons testified that fingerprints not matching the victim or defendant were found on several items in the room. Simmons further testified that the print on the sandwich bag could have been placed there by the person who opened the bag. Lastly, during closing arguments, defense counsel argued that the prints created reasonable doubt. Accordingly, counsel was not deficient for failing to call an expert witness to testify that the prints could not have resulted from the manufacturing process and the postconviction court properly denied this claim.

**Failure to Question Zeigler**

Whitton alleges that counsel was deficient for failing to question Zeigler about the threats she received in front of the jury. Whitton argues that this would have been compelling evidence for the jury to consider. However, Whitton cannot establish that counsel was deficient nor can he establish that he was prejudiced because Zeigler did not testify untruthfully at trial. Zeigler stated that she testified truthfully and her testimony was favorable to Whitton. Counsel moved for dismissal based on the threats Zeigler received, but the court denied the motion. Counsel then moved for a new trial which was also denied. However, counsel does not appear to have followed up. Counsel addressed the issue to the extent available at trial. Accordingly, Whitton cannot establish that counsel was deficient or that he was prejudiced, and the postconviction court properly denied his claim.

## Cellmark and Additional DNA Testing

Whitton alleges that trial counsel were deficient for failing to produce evidence that the State attempted to obtain DNA testing at another lab. Whitton's claim here contravenes his claim above that the State suppressed the evidence of such attempt. Whitton cannot establish that counsel was deficient. The FDLE results were favorable to the defense and it was sound trial strategy not to call attention to the State's attempt to obtain additional testing that might have caused the jury to doubt the credibility of the results. Further, Whitton cannot establish prejudice because the results were favorable to him and it is not likely that the outcome of the trial would have been different. Accordingly, the postconviction court properly denied this claim.

## Forensic Pathologist

Whitton alleges that trial counsel were ineffective for failing to present evidence to rebut the coroner's determination that Mauldin struggled for thirty minutes before he died from his injuries. Whitton further alleges that counsel were ineffective for failing to present evidence that there were likely two weapons used and two people involved in Mauldin's murder. Whitton presented the evidence of Dr. Leroy Riddick at the evidentiary hearing. Dr. Riddick disagreed with the trial testimony of Dr. Edmund Kielman.

Whitton cannot establish prejudice.  Although Dr. Riddick's testimony differed from that of Dr. Kielman, there was nothing presented at the evidentiary hearing that affected Whitton's guilt.  It is therefore not likely that Whitton would have been found not guilty if counsel had presented Dr. Riddick's testimony at trial.  Further, Dr. Riddick's testimony would not have negated the trial court's finding of the HAC aggravator.  Therefore, it is also not likely that Whitton would have received a lesser sentence.  Accordingly, the postconviction court properly denied relief on this claim.

**Time of Death**

Whitton alleges that counsel were deficient for failing to more extensively cross-examine  Dr. Kielman regarding Mauldin's time of death.  The only evidence presented at the evidentiary hearing to support this claim was Dr. Riddick's testimony that the struggle was likely approximately five minutes rather than the thirty minutes Dr. Kielman opined elapsed.  Dr. Riddick opined that the time of death was between 5:00 p.m. and 11:00 p.m. on October 9.  Dr. Kielman's trial testimony provided that the time of death could have been from 11:00 a.m. on October 9 to 11:00 a.m. on October 10, 1990.  Accordingly, Dr. Riddick's testimony did not contradict Dr. Kielman's.  Whitton cannot establish that he was prejudiced, and the postconviction court properly denied this claim.

**Motive**

Whitton alleges that trial counsel was deficient for failing to present the testimony of Debra Sims at trial to rebut the State's theory of Whitton's motive for killing Mauldin. Whitton alleges that Sims would have testified that she gave him money to pay his bills and that he was not affected by losing his job because he had another job lined up. As it relates to the testimony that Whitton had another job, such testimony would have been hearsay. Counsel cannot be deemed deficient for failing to submit inadmissible evidence at trial. Further, Whitton cannot establish prejudice. Sims' testimony that she gave him $200 would not likely have changed the outcome of the trial. At trial, evidence was presented that Whitton's past due bills were paid on the day after the murder. It is not likely that the jury would have reached a different verdict if it had heard Sims' testimony. Accordingly, the postconviction court properly denied this claim.

**Blood Evidence Testimony**

Whitton alleges that trial counsel were ineffective for failing to argue that the blood evidence found in his car was consistent with his story that he walked through Mauldin's blood when he found Mauldin's body. Whitton's claim is disputed by the record. Counsel argued during closing that only three drops of blood were found in Whitton's car and that the person who committed the murder

would have been covered in blood. Whitton has failed to demonstrate that this was deficient. Accordingly, the postconviction court properly denied this claim.

**Crime Scene**

Whitton alleges that counsel were ineffective for failing to present evidence that the crime scene was not properly processed. By Whitton's own allegation, counsel were not aware that any evidence was returned to the victim's family without being tested. Counsel cannot be deficient for failing to introduce evidence that was unknown at the time of trial. Further, Whitton failed to present evidence to support this claim. See Dennis v. State, 109 So. 3d 680, 694-95 (Fla. 2012) (finding that defendant's failure to allege which experts should have been hired, what these experts would have testified, and how the failure prejudiced the defendant, was sufficient to support denial of the defendant's postconviction claim.). Accordingly, the postconviction court properly denied this claim.

**Alternate Theory of Crime**

Whitton alleges that counsel were deficient for failing to present testimony that Mauldin was flashing his money, had previously been "rolled" by a prostitute, and was seeking the services of a prostitute on the night of his murder. The evidence presented at the evidentiary hearing does not support Whitton's claim. Whitton argues that Maudlin could have been "rolled" by a prostitute; however, at the evidentiary hearing, the cab driver testified that he did not. Whitton, therefore,

cannot establish that he was prejudiced by counsel's failure to present evidence to support this theory at trial. Whitton did not produce any credible evidence at the evidentiary hearing that someone else murdered Mauldin. Accordingly, the postconviction court properly denied this claim.

**John Maleszewski**

Whitton argues that counsel were ineffective for failing to impeach hotel clerk Maleszewski's inconsistent testimony. Whitton's argument here is refuted by the record. The record demonstrates that trial counsel impeached Maleszewski extensively. Accordingly, Whitton has not established that counsel were deficient, and the postconviction court properly denied this claim.

**Investigation and Impeachment of Snitches**

Whitton alleges that trial counsel were ineffective for failing to interview jail inmates to find witnesses to refute Ozio's and McCollough's testimony. Whitton failed to present any evidence that would have been admissible at trial. Further, the record demonstrates that both McCollough and Ozio were impeached extensively at trial. Whitton failed to demonstrate that counsel were deficient. Accordingly, the postconviction court properly denied this claim.

## Juror Communication

### Juror Notes

Whitton alleges that the trial judge and bailiff communicated with the jury outside the presence of the defendant and counsel in violation of Florida Rule of Criminal Procedure 3.410.[2] Whitton's allegation is based on five notes from the jury of which he says he was unaware until recently. Whitton's claim is refuted by the record and thus without merit. Additionally, two of the notes do not comprise communication within the scope of rule 3.410, and therefore do not constitute error.[3] Whitton's claim fails because these communications do not fall within the scope of rule 3.410. See Mendoza v. State, 700 So. 2d 670, 674 (Fla. 1997).

---

2. Rule 3.410 provides:

> After the jurors have retired to consider their verdict, if they request additional instructions or to have any testimony read or played back to them they may be conducted into the courtroom by the officer who has them in charge and the court may give them the additional instructions or may order the testimony read or played back to them. The instructions shall be given and the testimony presented only after notice to the prosecuting attorney and to counsel for the defendant. All testimony read or played back must be done in open court in the presence of all parties. In its discretion, the court may respond in writing to the inquiry without having the jury brought before the court, provided the parties have received the opportunity to place objections on the record and both the inquiry and response are made part of the record.

Fla. R. Crim. P. Rule 3.410 (last amended November 8, 2012).

3. The first note in the record states, "Is it to our understanding that a lady in the audience has a tape recorder recording this? We the jury object. It

gives us an uneasy feeling." In the trial record, this note appears to have been presented at the beginning of the defense's portion of the penalty phase, right before counsel Tongue began questioning Dr. Larson. The trial judge responded in open court, stating, "Let me make a general announcement before you call your first witness, and that would be simply to advise the jury that I have dealt with the situation that you brought to my attention. And I will, for the record, just file this note with the clerk."

Whitton's claim regarding this note fails for several reasons. First, as demonstrated by the record, this communication did not fall under the scope of rule 3.140 because it was not a request from the jury for additional instruction during deliberations. Second, the note was addressed in open court with counsel for the defense, the State, the defendant, and the jury present. Accordingly, Whitton is not entitled to relief.

The fifth note in the record states, "I understand you may have a question. If so, please write it down and Tim will hand it to me." L. Melvin, Judge. On the same page, the jury appears to have written its response, "Mrs. Keyser's feet cannot touch floor in jury box which is causing feet to swell—could I get a box to prop up feet." This exchange was captured in the trial record. The trial judge and counsel discussed the procedure for notes at length:

> The Court: I've just gotten a note that reads: "Some of the jurors want to ask a question. May they write it down?" The note was handed to me by my bailiff. I will—If they're going to ask a question, I want it written down. I don't want them to simply verbalize it in the courtroom. Logistically, I think I need to bring them in and tell them that if they have a question they need to write it down and hand it to the bailiff.

> Mr. Bishop: Judge, for the record, we would just allow Mr. Crenshaw to deliver that message. I mean, we are all here in the courtroom. I think, that for purposes of the record, we can lay out that the jury room door is located in front of the Court, that we would be able to observe Mr. Crenshaw enter the room, he can deliver the pad, come back, pick the message up from them, and we can just find out what it is at that time. We would have no objection to, the defense, handling it that way.

> The Court: All right. Does the State have any objection?

> Mr. Adkinson: (Indicating in the negative)

This Court has held that, where . . . there are communications between the judge and the juror outside the express notice requirements of rule 3.410, Florida Rules of Criminal Procedure, a harmless error analysis applies. See Williams v. State, 488 So. 2d 62, 64 (Fla. 1986). Indeed, the United States Supreme Court has held that, even where such communications are not recorded . . . and are not subsequently disclosed to counsel . . . they are still subject to a harmless error analysis. See Rushen v. Spain, 464 U.S. 114 (1983).

Lebron v. State, 799 So. 2d 997, 1015 (Fla. 2001).

---

The Court: I will then write a note for the bailiff to hand into the jury room and wait outside for them to write a response back.

Mr. Bishop: Do you want to go forward with the testimony, or take a break at this point?

The Court: Let me see what they say. My note to the jury reads: "I understand you may have a question. If so, please write it down and Tim will hand it to me."

[an apparent break while they await the response]

The Court: What makes makes (sic) this funny is an inside joke. I'm sitting in the burgundy chair now instead of the big one because my feet don't touch the floor in the big brown one. This note says, "Mrs. Keyser's feet cannot touch the floor in the jury box, which is causing her feet to swell. Could I get a box to prop up my feet?" And, so we do need to get her something to prop her feet up on.

This exchange happened during the State's case-in-chief prior to the direct examination of Dr. Kielman. Accordingly, the communication does not fall within the scope of rule 3.140. Therefore, the note is subject to harmless error analysis. See Lebron v. State, 799 So. 2d 997, 1015 (Fla. 2001). As indicated by the record, the communication happened in open court and counsel did not object. Indeed, defense counsel Bishop testified at the evidentiary hearing that he remembered the note about the juror's feet not being able to reach the floor. Additionally, this portion of the record appears to demonstrate that the process for juror notes was agreed upon by counsel for the defense, counsel for the State, and the trial judge. Whitton cannot demonstrate that any error occurred or that the error was prejudicial.

While the remaining notes[4] appear to fall within the scope of rule 3.410, we agree with the postconviction court that these claims are refuted by the record. Whitton's argument that he was unaware of the notes is refuted by counsel's testimony that he remembered the content of at least two of the notes.

We have stated that:

> Violations of rule 3.410 are per se reversible because communication between the judge and the jury, without notice to and outside the presence of the prosecutor, defense counsel, and the defendant, is too possibly prejudicial to be tolerated. Bradley v. State, 513 So. 2d 112 (Fla. 1987); Williams v. State, 488 So. 2d 62 (Fla. 1986); Curtis v. State, 480 So. 2d 1277 (Fla. 1985); Ivory v. State, 351 So. 2d 26 (Fla. 1977).

Brown v. State, 538 So. 2d 833, 834 (Fla. 1989). However, as we stated in Thomas v. State, 730 So. 2d 667, 668 (Fla. 1998), "The per se reversible error rule announced in Ivory is prophylactic in nature and must be invoked by contemporaneous objection at trial. Where counsel communicates to the trial judge his acceptance of the procedure employed, the issue will be considered waived." Id. at 668 (footnotes and emphasis omitted); see also, Lebron, 799 So. 2d

---

4.  The second note in the record states, "List of her (Judge Melvin's) instruction (sic) to the jury."

The third note in the record states, "What is the soonest possible time he could get out of prison? Gain time? Model prisoner? etc. Or is 25 yrs the soonest he could get out?"

The fourth note in the record appears to be Judge Melvin's response to the note above. It states, "With regard to your question, please refer to the jury instructions. L. Melvin, Judge."

at 1017 n.2; <u>Mendoza</u>, 700 So. 2d at 674.  Here, Whitton's counsel remembered several of the notes, including the one regarding Whitton's sentence.  Accordingly, on the entire record before us, it appears that counsel could have objected contemporaneously.  <u>See</u> <u>Thomas</u>, 730 So. 2d at 668.  We note, however, the importance of ensuring a complete record during trial and admonish trial judges to remember:

> Any communication with the jury outside the presence of the prosecutor, the defendant, and defendant's counsel is so fraught with potential prejudice that it cannot be considered harmless. . . .
>  . . . it is prejudicial error for a trial judge to respond to a request from the jury without the prosecuting attorney, the defendant, and defendant's counsel being present and having the opportunity to participate in the discussion of the action to be taken on the jury's request.

<u>Ivory</u>, 351 So. 2d at 28.

### Juror Interviews

The second part of Whitton's juror communication claim is that the postconviction court erred by denying him an opportunity to interview the jury. This issue is reviewed for an abuse of discretion.  <u>Marshall v. State</u>, 976 So. 2d 1071, 1076 (Fla. 2007) (citing <u>Boyd v. State</u>, 910 So. 2d 167, 178 (Fla. 2005)). This Court has stated:

> "Juror interviews are not permissible unless the moving party has made sworn allegations that, if true, would require the court to order a new trial because the alleged error was so fundamental and prejudicial as to vitiate the entire proceedings."  <u>Johnson v. State</u>, 804 So. 2d

1218, 1224 (Fla. 2001) (citing <u>Baptist Hosp. of Miami, Inc. v. Maler</u>, 579 So. 2d 97, 100 (Fla. 1991)).

<u>Power v. State</u>, 886 So. 2d 952, 957 (Fla. 2004). Because there was no fundamental or prejudicial error, the postconviction court properly denied juror interviews.

## Investigation of Mitigation

In his fourth issue on appeal, Whitton alleges that trial counsel failed to properly investigate mitigation. The trial court found in mitigation that Whitton suffered a deprived childhood and poor upbringing, that he was abused as a child, specifically that he was abused by his alcoholic parents, and that Whitton had an unstable personality consistent with parental alcoholism and child abuse. Because the evidence presented at the evidentiary hearing was cumulative to that considered during Whitton's penalty phase, he cannot establish that counsel's failure to talk to additional members of his family created prejudice. Accordingly, the postconviction court properly denied this claim.

This Court has stated that trial counsel has a duty to investigate mitigation. " 'In reviewing a claim that counsel's representation was ineffective based on a failure to investigate or present mitigating evidence, the Court requires the defendant to demonstrate that the deficient performance deprived the defendant of a reliable penalty phase proceeding.' " <u>Simmons v. State</u>, 105 So. 3d 475, 503 (Fla. 2012) (quoting <u>Hoskins v. State</u>, 75 So. 3d 250, 254 (Fla. 2011)).

> "It is unquestioned that under the prevailing professional norms . . . counsel ha[s] an 'obligation to conduct a thorough investigation of the defendant's background.' " Moreover, counsel must not ignore pertinent avenues for investigation of which he or she should have been aware. "[I]t is axiomatic that 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' "

Id. Here, counsel spoke to several of Whitton's family members who resided in Florida. Their combined information supplied sufficient evidence for the trial court to find multiple mitigating factors relating to Whitton's childhood. Admittedly, counsel did not travel to New York to inquire further into Whitton's background.

Relating to the evidence in support of mitigation, the trial court found:

> The evidence is clear that the Defendant is an adult child of two alcoholic parents, that he was physically and mentally abused by his parents, and that he suffered a deprived childhood and poor upbringing. The evidence also demonstrated that other siblings from this same family environment are productive, law abiding citizens. The Court finds that these mitigating circumstances have been established and they are given considerable weight by this court.

The jury recommended the sentence of death in a unanimous verdict.

Whitton cannot establish that he was prejudiced. As noted, the additional testimony provided at the evidentiary hearing was cumulative to that presented at trial. It is therefore not likely that he would have received a lesser sentence if counsel had presented the additional witnesses. Accordingly, the lower court properly denied this claim.

Whitton next alleges that counsel was deficient for failing to appoint experts to testify regarding his likely fetal alcohol syndrome. Whitton's claim is refuted by the record. Counsel appointed Dr. James Larson, who testified "that the Defendant had a full scale IQ of 84, indicating that his level of intellectual functioning was in the Low Average range. . . . that the Defendant does not have a major mental illness, but that he does have an unstable personality, consistent with alcoholism and child abuse." Pursuant to Dr. Larson's testimony, the trial court found mental problems as a mitigating factor and gave them some weight. Id. This Court has stated that trial counsel is not deficient simply because postconviction counsel could find a more favorable expert. See Hoskins v. State, 75 So. 3d 250, 255 (Fla. 2011) (" 'This Court has repeatedly held that counsel's entire investigation and presentation will not be rendered deficient simply because a defendant has now found a more favorable expert.' " (quoting Card v. State, 992 So. 2d 810, 818 (Fla. 2008))). Accordingly, just because Whitton has found an expert who would diagnose him as having fetal alcohol syndrome does not mean that counsel provided deficient performance at the trial. Further, even if this Court finds that counsel was deficient, because the evidence would be stronger, but cumulative to that provided at trial, Whitton cannot establish prejudice. Therefore, the postconviction court properly denied this claim.

**Cumulative Error**

In his final claim on appeal, Whitton argues that the cumulative effect of the errors in his trial entitle him to a new trial. The postconviction court denied this claim below, finding that Whitton was not entitled to cumulative relief where there had been no error found. The lower court is correct. As discussed above, Whitton is not entitled to relief on any of his claims and is therefore not entitled to relief based on cumulative error. See Merck, 124 So. 3d at 802.

**PETITION FOR WRIT OF HABEAS CORPUS**

In Whitton's first habeas issue, he refashions one of his postconviction claims into an ineffective assistance of appellate counsel claim. In his postconviction motion, he alleged both that the State had offered false testimony through McCollough and Ozio, and had suppressed evidence relating to McCollough. Whitton argues that appellate counsel was ineffective for failing to follow up on McCollough's recantation.

Claims of ineffective assistance of appellate counsel are properly raised in a petition for writ of habeas corpus. See Jackson v. State, 127 So. 3d 447, 476 (Fla. Sept. 2013) (citing Freeman v. State, 761 So. 2d 1055, 1069 (Fla. 2000)). "In raising such a claim, the defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Id. (internal quotation marks and alterations omitted). Consistent with

the Strickland standard, to grant habeas relief based on ineffective assistance of counsel, this Court must determine:

> first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.

Pope v. Wainwright, 496 So. 2d 798, 800 (Fla. 1986); see also Freeman, 761 So. 2d at 1069; Thompson v. State, 759 So. 2d 650, 660 (Fla. 2000). In raising such a claim, "[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Freeman, 761 So. 2d at 1069; see also Knight v. State, 394 So. 2d 997, 1001 (Fla. 1981).

Whitton has not established that appellate counsel's omission constitutes a substantial deficiency outside the range of professionally acceptable performance. Saunders testified that she received the communication from Billy Key that McCollough wished to issue a statement recanting his trial testimony. She contacted trial counsel, who asked her to secure the statement. Saunders attempts were thwarted because McCollough refused to issue a statement unless the State agreed that he would not be prosecuted for perjury. Because Saunders could not overcome his refusal, McCollough did not submit a statement. Whitton does not

provide any caselaw to support his assertion that Saunders owed him a greater duty.

Further, Whitton cannot establish prejudice. As discussed above, recantations are not credible. Without McCollough's testimony, Ozio's testimony would still have provided the jury with evidence that Whitton admitted to murdering Maudlin. That, coupled with the overwhelming evidence against Whitton, makes it extremely unlikely that McCollough's recantation would have changed the outcome of the trial.

Because we determine that the specific error alleged is not one for which Whitton is entitled to relief, we find that counsel is not deficient for failing to raise a meritless argument. "If a legal issue 'would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective." Rutherford v. Moore, 774 So. 2d 637, 643 (Fla. 2000) (quoting Williamson v. Dugger, 651 So. 2d 84, 86 (Fla. 1994)).

In Whitton's second habeas issue, he argues that appellate counsel was ineffective for failing to ensure the record was complete by ensuring that the notes to and from the jury were included in the record. As with the previous issue, this claim is properly raised and the standard is as discussed above. See Jackson, 127 So. 3d at 476. Because we determined that Whitton would not have been entitled

to relief on this issue, we likewise determine that counsel was not deficient. See Rutherford, supra.

## CONCLUSION

For the foregoing reasons, we affirm the postconviction court's denial of Whitton's 3.851 motion and deny his petition for a writ of habeas corpus.

It is so ordered.

LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.
LABARGA, C.J., concurs with an opinion, in which PARIENTE, J. concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

LABARGA, C.J., concurring.

I concur with the majority opinion. I write separately, however, to address the lack of clarity in the record with respect to the notes submitted by the jury and to emphasize the need for trial courts to fully comply with the requirements of Florida Rule of Criminal Procedure 3.410. Rule 3.410 establishes a procedure for trial courts to follow when jurors request that additional instructions be provided or that testimony be read or played back. This rule serves the dual purpose of protecting the interests of parties and preserving the record. Its purpose is clear.

Jury deliberations are sacrosanct, and the impact of a jury's deliberations cannot be overstated. It is of paramount importance that both parties be made aware of any inquiries from the jurors and that the treatment of these inquiries is

- 36 -

fully reflected in the record. Although not every juror inquiry that falls within the scope of rule 3.410 will result in the jury being brought back into open court to receive additional instructions or a read-back or play-back of testimony, the rule is clear that every inquiry will result in notice to counsel for both parties. Moreover, rule 3.410 envisions that the record will clearly reflect the discussion and the resolution of the juror inquiry, which necessarily involves input from both parties.

When the trial court receives an inquiry from the jury, after notifying the prosecuting attorney and counsel for the defendant, the court should go on the record and read the note aloud in the presence of the defendant, defense counsel, and the prosecuting attorney. Then, still on the record, the trial court should invite input from both parties as to how to respond to the inquiry. The trial court should not respond to any inquiry from the jurors without first discussing the matter on the record with both parties. Strict adherence to this procedure is necessary to protect the defendant and the State, preserve the record, and assist the appellate court upon review.

PARIENTE, J., concurs.

Two Cases:

An Appeal from the Circuit Court in and for Walton County,
    Michael Gordon Allen, Judge - Case No. 661990CF000429CFAXMX
And an Original Proceeding – Habeas Corpus

Mark Evan Olive of the Law Offices of Mark E. Olive, P.A., Tallahassee, Florida,

    for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, and Carolyn Marie Snurkowski, Associate Deputy Attorney General, Tallahassee, Florida, and Carol Marie Dittmar, Senior Assistant Attorney General, Tampa, Florida,

    for Appellee/Respondent