# Supreme Court of Florida

_____

No. SC18-340
_____

**JOHNNY MACK SKETO CALHOUN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC18-1174
_____

**JOHNNY MACK SKETO CALHOUN,**
Petitioner,

vs.

**MARK S. INCH, etc.,**
Respondent.

November 21, 2019

PER CURIAM.

Johnny Mack Sketo Calhoun appeals the denial of his motion to vacate his

conviction of first-degree murder filed under Florida Rule of Criminal Procedure

3.851, and he also petitions this Court for a writ of habeas corpus. We have

jurisdiction. *See* art. V, § 3(b)(1), (9), Fla. Const. For the reasons below, we affirm the circuit court's order denying Calhoun relief from his conviction and deny his habeas petition.

## I. BACKGROUND

The facts of this case, including the overwhelming evidence of Calhoun's guilt, were fully set out in this Court's opinion on direct appeal. *See Calhoun v. State*, 138 So. 3d 350 (Fla. 2013), *cert. denied*, 135 S. Ct. 236 (2014). Briefly, between the evening hours of December 16, 2010, and the morning hours of December 17, 2010, Calhoun kidnapped the victim, Mia Chay Brown, from his trailer in Holmes County, Florida, bound her with coaxial cable and duct tape and forced her into the trunk of her own car. *Id.* at 367. Calhoun then drove the victim's car to a convenience store located between Enterprise and Hartford, Alabama, where he was seen by witnesses at approximately 6 a.m. on December 17, including one witness who testified that Calhoun had scratches and dried blood on his hands and was driving a car that matched the description of the victim's vehicle. *Id.* at 355, 366. Within hours of Calhoun's stopping at the convenience store, other witnesses reported seeing smoke from the highway in Geneva, Alabama. *Id.* at 356. The victim's burned body and car were found on December 20 in a wooded area in Geneva, Alabama, which was approximately 1488 feet from a campsite that Calhoun was known to frequent, *see id.* at 366-67,

approximately thirteen miles south of the Alabama convenience store[1] where Calhoun was seen on the morning of December 17, approximately ten miles north of Calhoun's trailer in Florida, *see id.* at 356, 363, and approximately 1.5 miles from an Alabama residence belonging to acquaintances of Calhoun's, one of whom found a wet and dirty Calhoun wrapped in sleeping bags and lying on the ground in her family's shed on the morning of December 18, and invited him inside her family's home, *see id.* at 355-56. Calhoun left the home of his acquaintances shortly after the acquaintances learned that he and the victim had been reported missing. *Id.* at 355. Two days later, on December 20, law enforcement found him hiding under his bed in his trailer and arrested him. *Id.* at 354, 357.

After hearing the evidence summarized in this Court's decision on direct appeal, including witness accounts tying the victim to Calhoun and his trailer shortly before her disappearance and tying Calhoun to the victim's car shortly before her murder, DNA evidence placing both Calhoun and the victim's blood on the same blanket in Calhoun's trailer, DNA evidence establishing that blood on the cardboard of a roll of duct tape recovered from Calhoun's trailer was a major donor match to the victim and a minor donor partial match to Calhoun, DNA evidence placing the victim's hair in Calhoun's trailer, and testimony establishing

---

1. Calhoun's initial brief represents that the "store is located 13 miles north of where [the victim's] car was discovered."

that items belonging to the victim were recovered from Calhoun's trailer, *id.* at 366, Calhoun's jury found him guilty of first-degree murder and kidnapping, *id.* at 358. Following the penalty phase presentation, the jury recommended death by a vote of nine to three for the murder. *Id.* at 359. The trial court followed the jury's recommendation and sentenced Calhoun to death for the murder and also sentenced Calhoun to 100 years of imprisonment for the kidnapping. *Id.*

On direct appeal, this Court affirmed Calhoun's convictions and sentences.[2] *Id.* at 368. Thereafter, the United States Supreme Court denied Calhoun's petition for a writ of certiorari. *Calhoun v. Florida*, 135 S. Ct. 236 (2014).

In 2015, Calhoun filed an initial motion for postconviction relief, which the circuit court subsequently granted him leave to amend four times. Following an evidentiary hearing, the circuit court denied relief on all of Calhoun's guilt-phase claims but vacated Calhoun's death sentence and ordered a new penalty phase pursuant to *Hurst v. State*, 202 So. 3d 40 (Fla. 2016). Calhoun appeals the circuit court's denial of several of his guilt-phase claims, the circuit court's denials of

---

2. Calhoun raised the following claims on direct appeal: "(1) whether the trial court erred in excluding Calhoun's exculpatory statements to police under the rule of completeness; (2) whether the trial court erred in finding the aggravators of CCP and avoiding arrest; and (3) a *Ring* [*v. Arizona*, 536 U.S. 584 (2002),] claim." *Calhoun*, 138 So. 3d at 359. This Court also reviewed sufficiency of the evidence supporting Calhoun's first-degree murder conviction under both premeditated and felony murder theories, as well as the sufficiency of the evidence to support the kidnapping conviction, and the proportionality of his death sentence. *Id.* at 365-68.

motions in which Calhoun sought to amend his postconviction motion two additional times and to reopen the evidentiary hearing, and the circuit court's use of the State's written arguments in its order denying relief on Calhoun's guilt-phase claims. He also petitions this Court for a writ of habeas corpus.

## II. POSTCONVICTION APPEAL

### A. Newly Discovered Evidence

Calhoun first claims that newly discovered evidence pertaining to Doug Mixon, which Calhoun argues implicates Mixon in the victim's murder, requires a new trial. More specifically, Calhoun contends that Mixon, who is the father of Calhoun's former girlfriend, told Robert Vermillion, who is related to the victim's husband, that Mixon murdered the victim. Calhoun also claims that Natasha Simmons, whose former boyfriend is acquainted with Mixon, had a suspicious encounter with Mixon near the Alabama-Florida line around the time of the victim's disappearance that tends to implicate Mixon in the victim's murder. We disagree that this evidence entitles Calhoun to a new trial because when considered cumulatively with all of the evidence that would be admissible on retrial, the newly discovered evidence from Simmons and Vermillion—which, as the circuit court found, poses admissibility and credibility problems—does not so weaken the State's case against Calhoun as to give rise to a reasonable doubt as to Calhoun's culpability.

As we have explained, the following two requirements must be met to set aside a conviction on the basis of newly discovered evidence:

> First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. *See Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998) (*Jones II*). Newly discovered evidence satisfies the second prong of the *Jones II* test if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." *Jones II*, 709 So. 2d at 526 (quoting *Jones v State*, 678 So. 2d 309, 315 (Fla. 1996)).

*Marek v. State*, 14 So. 3d 985, 990 (Fla. 2009).

In this case, the State does not dispute that the evidence from Simmons and Vermillion is newly discovered evidence within the meaning of the first prong of the *Jones II* test. Therefore, the only question is whether the newly discovered evidence satisfies the second prong, namely whether it would probably produce an acquittal on retrial. This Court has explained that, in evaluating the second prong,

> the postconviction court must "consider all newly discovered evidence which would be admissible" and must "evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial." [*Jones v. State*, 591 So. 2d 911, 916 (Fla. 1991) (*Jones I*)]. This determination includes
>
>> whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether this evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.

*Jones II*, 709 So. 2d at 521 (citations omitted).

*Marek*, 14 So. 3d at 990; *see also Swafford v. State*, 125 So. 3d 760, 775-76 (Fla. 2013) ("The *Jones* [*II*] standard requires that, in considering the effect of the newly discovered evidence, we consider all of the admissible evidence that could be introduced at a new trial. In determining the impact of the newly discovered evidence, the Court must conduct a cumulative analysis of all the evidence so that there is a 'total picture' of the case and 'all the circumstances of the case.' " (citation omitted) (quoting *Lightbourne v. State*, 742 So. 2d 238, 247 (Fla. 1999))).

Further, when, as in Calhoun's case, the circuit court rules on a newly discovered evidence claim after an evidentiary hearing, this Court "review[s] the trial court's findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence." *Green v. State*, 975 So. 2d 1090, 1100 (Fla. 2008). This Court "review[s] the trial court's application of the law to the facts de novo." *Id.*

In this case, as the circuit court ruled, the newly discovered evidence poses both admissibility and credibility problems. Regarding Vermillion, Mixon's alleged statements to Vermillion requesting forgiveness for doing a lot of things he is not proud of are hearsay and, thus, not admissible as substantive evidence. Moreover, in light of Calhoun's direction not to call Doug Mixon as a witness at trial, it would not be possible to impeach Mixon—who testified at the evidentiary

- 7 -

hearing and denied that he was involved in or had confessed to the victim's murder—with his alleged statement to Vermillion. But, even if this evidence were admissible, Vermillion testified at the postconviction evidentiary hearing that he could not say that Mixon had confessed to killing the victim, only that Vermillion believed Mixon implied it. After hearing testimony at the evidentiary hearing from both Vermillion and Mixon, who denied any involvement in the victim's murder and denied having confessed to it, the circuit court found that Vermillion's testimony is "false." We defer to that finding because competent, substantial evidence supports it. *See Green*, 975 So. 2d at 1100.

Similar credibility problems exist with Simmons's account. Simmons testified at the postconviction evidentiary hearing that she picked up Doug Mixon and her then-boyfriend near the Alabama-Florida line around the time of the victim's disappearance and that Mixon had blood on his chest and was running with a gas can.[3] Although Simmons's account of her suspicious encounter with Mixon—aside from any hearsay statements by Mixon—would be admissible as

---

3. To the extent that Simmons's statement that Mixon had an empty gas can suggests that Mixon used gas as an accelerant to burn the victim's vehicle, this conflicts with the evidence presented at trial. At trial, a crime laboratory analyst with the State Fire Marshal's Office testified that ignitable liquid—"light petroleum distillate"—had been used as an accelerant and was found in samples of fire debris from the victim's car. He further testified that examples of light petroleum distillate include "camp fuel" and "lighter fluid," but exclude "anything that's contained in a vehicle [like] oil or gas or anything like that."

substantive evidence, competent, substantial evidence supports the circuit court's finding that Simmons did not relay this information to law enforcement despite Simmons's claim that she had, severely undermining her credibility. Specifically, Simmons testified at the evidentiary hearing that she reported the incident to the then-sheriff of Geneva County, Alabama, Greg Ward, but Ward told her she was wasting her time because the killer had already been caught and had confessed. However, Ward testified at the evidentiary hearing that he did not recall getting any information from Simmons about anything and that he did not recall Simmons reporting any encounter with Mixon. Ward was adamant that he never told Simmons to forget about her encounter with Mixon because the killer had been caught and had confessed. Rather, Ward testified that if someone had reported something like that, he would have given the information to the Alabama Bureau of Investigation (ABI) because the case was turned over to ABI after the victim's body and vehicle were found in Geneva County, Alabama. The lead investigator for the State of Florida, Lieutenant Michael Raley of the Holmes County Sheriff's Office, testified at the postconviction evidentiary hearing that neither Ward nor the ABI had provided any information about statements from Simmons regarding Doug Mixon's involvement in the victim's murder. Thus, despite its admissibility, as the circuit court found, there are credibility concerns with Simmons's testimony.

But even assuming no admissibility or credibility problems with Vermillion's testimony and no credibility problem with Simmons's testimony, when the newly discovered evidence from Simmons and Vermillion regarding Doug Mixon is considered cumulatively with all of the evidence that would be admissible on retrial, it does not so weaken the State's case against Calhoun as to give rise to a reasonable doubt as to Calhoun's culpability. The evidence shows that the victim was going to pick up Calhoun, not Mixon, when she disappeared on the evening of December 16, 2010. DNA evidence places Calhoun's blood, not Mixon's, near the victim's blood on a blanket in Calhoun's trailer. DNA evidence also establishes that blood found on the cardboard of a roll of duct tape taken from Calhoun's trailer was a major donor match to the victim and a minor donor partial match to Calhoun. An eyewitness places a scratched and bloody Calhoun, and no one else, driving a car that matched the description of the victim's vehicle in the early morning hours of December 17, the day after the victim disappeared, just hours before witnesses saw smoke from the highway near where the victim's burned car and body (which had tape on the neck) were eventually found. The next morning, on December 18, Calhoun's acquaintance found him, and no one else, wrapped in sleeping bags and lying on the ground in her family's shed approximately 1.5 miles from where the victim's burned car and body were found.

And Calhoun, not Mixon, evaded law enforcement and was found hiding under his bed.

Accordingly, because Calhoun has failed to establish that newly discovered evidence from Simmons and Vermillion would probably produce an acquittal on retrial, we affirm the circuit court's denial of relief as to this claim. *See Jones II*, 709 So. 2d at 521; *cf. Preston v. State*, 970 So. 2d 789, 801 (Fla. 2007) (holding that when the newly discovered evidence was considered with all of the evidence that would be admissible in a retrial, "in light of the overwhelming evidence of [the defendant's] guilt presented at trial," the newly discovered evidence "would probably not produce an acquittal on retrial").

## B. Ineffective Assistance During the Guilt Phase

Next, Calhoun argues that trial counsel was ineffective during the guilt phase (1) for failing to investigate Doug Mixon's alibi; (2) for failing to consult with or hire a forensic pathologist and a digital forensic expert; and (3) in handling twelve trial witnesses.

Following the United States Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), this Court has explained that, to prevail on an ineffective assistance of counsel claim, a defendant must satisfy two requirements:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be

demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

*Bolin v. State*, 41 So. 3d 151, 155 (Fla. 2010) (quoting *Maxwell v. Wainwright*, 490 So. 2d 927, 932 (Fla. 1986)).

Regarding *Strickland*'s deficiency prong, there is a strong presumption that trial counsel's performance was not ineffective. *Strickland*, 466 U.S. at 689. Moreover, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* The defendant bears the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Regarding the prejudice prong, "*Strickland* requires defendants to show 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . [A] 'reasonable probability' is a 'probability sufficient to undermine confidence in the outcome.' " *Henry v. State*, 948 So. 2d 609, 621 (Fla. 2006) (quoting *Strickland*, 466 U.S. at 694).

Because both prongs of *Strickland* present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's

factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. *See Sochor v. State*, 883 So. 2d 766, 771-72 (Fla. 2004). Moreover, "when a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong." *Zakrzewski v. State*, 866 So. 2d 688, 692 (Fla. 2003) (quoting *Waterhouse v. State*, 792 So. 2d 1176, 1182 (Fla. 2001)).

As explained below, we affirm the circuit court's denial of relief as to each of Calhoun's ineffective assistance of counsel claims.

### (1) Doug Mixon's Alibi

Calhoun first argues that his trial counsel was ineffective for failing to investigate Doug Mixon's alibi by speaking with Jose Contreras, in whose Geneva, Alabama, home Mixon and his then-girlfriend claimed in their pretrial depositions to have spent the night of December 16, 2010, when the victim disappeared. Contreras testified at the postconviction evidentiary hearing that, if trial counsel had spoken with him, he would have informed counsel that Mixon had not spent the night of December 16, or any other night, at his home. Contreras further testified that he would have informed counsel that Mixon confessed to Contreras that he had murdered the victim and that Contreras had reported what Mixon told him to Officer Ricky Morgan of the Geneva Police Department.

Other witnesses at the evidentiary hearing contradicted Contreras's testimony. Specifically, Officer Morgan testified that Contreras never told him that Mixon had confessed to the victim's murder, and that if he had received this information, he would have provided it to the Holmes County Sheriff's Office. Lieutenant Raley of the Holmes County Sheriff's Office testified that he had never been informed by the Geneva Police Department or any other agency that Mixon had confessed to Contreras. Doug Mixon also testified at the evidentiary hearing and denied involvement in the victim's murder, denied knowing anything about the victim's murder, and denied that he had confessed to the victim's murder. After hearing from all of these witnesses, the circuit court found that Contreras's statements were "false." We defer to this finding because it is supported by competent, substantial evidence. *See Porter v. State*, 788 So. 2d 917, 923 (Fla. 2001) ("So long as [the trial court's] decisions are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact and, likewise, on the credibility of the witnesses and the weight to be given to the evidence by the trial court. We recognize and honor the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact." (citation omitted)). And we agree with the circuit court that trial counsel was not deficient for failing to discover Contreras's false statements regarding Doug Mixon, most of which constitute inadmissible hearsay.

- 14 -

Calhoun also cannot establish prejudice. There is no reasonable probability that the jury's verdict would have been different if trial counsel had spoken with Contreras about Mixon's alibi for the evening of the victim's disappearance or presented the admissible portions of Contreras's testimony at trial. At trial, the jury did not hear that Mixon had supposedly spent the evening of December 16 at Contreras's home; Contreras's name was never even mentioned. Rather, the jury heard testimony from Doug Mixon's daughter Brittany and Lieutenant Michael Raley, lead investigator for the Holmes County Sheriff's Office, that Mixon was with his then-girlfriend, back and forth between Geneva, Alabama, and Bonifay, Florida, on December 16 and 17, 2010, and that Mixon had spent the evening of December 16 with his then-girlfriend, in Geneva. The State did not argue that Mixon's alibi made it physically impossible for him to have been involved in the victim's kidnapping or murder. And, at Calhoun's insistence, Mixon did not testify at trial, and trial counsel made a strategic decision not to have Mixon's then-girlfriend testify. Thus, if trial counsel had spoken with Contreras, and if Contreras had testified that Mixon had not spent the evening of December 16 at his home, without the context of inadmissible hearsay regarding Mixon's supposedly spending the evening of December 16 at Contreras's home and allegedly confessing to the victim's murder, the evidentiary value of Contreras's testimony would have been miniscule, at best. All the jury would have learned from

Contreras was where Mixon was not on the evening of December 16. In light of the overwhelming evidence of Calhoun's guilt, there is no reasonable probability that, had trial counsel spoken with Contreras about Mixon's alibi or presented the admissible portions of Contreras's testimony to the jury, the jury's verdict would have been different. Thus, Calhoun cannot establish prejudice. *See Henry*, 948 So. 2d at 621 (quoting *Strickland*, 466 U.S. at 694).

Accordingly, we affirm the circuit court's denial of relief as to this claim.

### (2) Forensic Experts

Next, Calhoun contends that trial counsel was ineffective for failing to consult with and hire two forensic experts, namely a forensic pathologist and a digital forensic expert. As explained below, because trial counsel was not deficient and, in any event, there is no prejudice, we disagree and affirm the circuit court's denial of relief as to these claims.

First, Calhoun argues that trial counsel was ineffective for failing to use a forensic pathologist to explain that the scratches on Calhoun's body, which law enforcement photographed after Calhoun's arrest, were not caused by fingernails. However, trial counsel's testimony at the postconviction evidentiary hearing establishes that her decision not to use an expert to explain Calhoun's injuries was strategic in light of evidence placing Calhoun in the woods, which trial counsel

used to argue that the jury could reasonably conclude that Calhoun was scratched by briars.

Moreover, there is no prejudice. Although Calhoun's postconviction expert could not definitively opine as to how or when Calhoun's injuries occurred, even if Calhoun's jury had heard a forensic pathologist who "simply do[es not] know" how the scratches were caused opine that "it's not at all probable" they were caused by fingernails, but that "a briar patch is a reasonable explanation for some [of them]," there is no reasonable probability of a different verdict. Sherry Bradley testified at trial that she saw Calhoun at an Alabama convenience store the morning after the victim disappeared with scratches and dried blood on his hands. There was no evidence that Calhoun had been in the woods before then. Rather, Bradley testified that Calhoun drove to the store in a car that matched the description of the victim's vehicle. The jury also heard that Calhoun's blood and the victim's blood were found on the same blanket in Calhoun's trailer, that blood on cardboard from a roll of duct tape found in the trailer was a major donor match to the victim and a minor donor partial match to Calhoun, and that the trailer was in a state of disarray, consistent with Calhoun's having been injured during a struggle with the victim. That Calhoun later obtained scratches while in the woods after kidnapping and murdering the victim does not account for the evidence that Calhoun had scratches and dried blood on his hands when Bradley saw him in the convenience store,

before he was in the woods, the morning after the victim disappeared and shortly before other witnesses reported seeing smoke in the area where the victim's burned car and body were later found. Accordingly, there is no reasonable probability of a different outcome had trial counsel consulted or hired a forensic pathologist. Therefore, Calhoun has not established prejudice. *See Henry*, 948 So. 2d at 621 (quoting *Strickland*, 466 U.S. at 694).

Second, Calhoun argues that trial counsel was ineffective for failing to use a digital forensic expert to explain that law enforcement's accessing an SD card from the victim's camera that was found in Calhoun's trailer without a write-blocking protection device altered key evidence that the State used to determine that the last image on the card—which depicted the ceiling of Calhoun's trailer—was taken between 3:30 and 4 a.m. on December 17, 2010, the morning after the victim disappeared. However, trial counsel was not deficient for failing to present the largely cumulative testimony of an expert who could not opine that the State's mishandling of the SD card had any meaningful consequence to the calculation of when the last image was taken.

At trial, the jury heard from the State's digital evidence crime analyst, Jennifer Roeder, that the accuracy of the State's calculation depended upon no one having reset the camera's clock between the date and time of the last known photograph and the date and time of the final image depicting the ceiling of

Calhoun's trailer. The jury also heard testimony from Lieutenant Raley that he viewed the images on the card before sending it to the Florida Department of Law Enforcement to determine whether any of them were related to the case.

Although Calhoun's postconviction expert opined that law enforcement failed to handle the SD card in a forensically sound manner and that certain changes to metadata and access and creation dates post-dating law enforcement's seizure of the card were "problematic," he testified that he did not see any indication that the date and time had changed between the two photographs that the State had used to calculate the date and time of the photograph of Calhoun's ceiling. To the contrary, Calhoun's postconviction expert specifically testified that "[t]he calculation isn't problematic" and further acknowledged that an officer having inserted the SD card into a computer to see what was on it would explain why the access dates changed. Trial counsel was not deficient for failing to present expert testimony that would have been cumulative to the trial testimony of Roeder and Raley. *See State v. Bright*, 200 So. 3d 710, 737 (Fla. 2016) ("[F]ailure to present cumulative evidence does not establish unconstitutional ineffective assistance of counsel because its omission neither constitutes deficient performance nor results in sufficient prejudice.").

Moreover, there is no prejudice because evidence other than the State's calculation from the images on the SD card established the timeline that the State

relied upon to tie Calhoun to the victim's kidnapping and murder. Specifically, the evidence showed that the victim had only ever been to Calhoun's trailer once, on the evening of December 16, and Calhoun's neighbor placed the victim at his trailer looking for Calhoun at approximately 8:40 p.m. that evening. That the victim actually made it to Calhoun's trailer was established because the victim's property (e.g., SD card, clothes, and purse) was recovered from inside the trailer and because the victim's blood and hair were found inside the trailer (as confirmed by DNA testing). Further, trial testimony established that no one was inside Calhoun's trailer at approximately 7:30 to 8 a.m. the next morning when Calhoun's father and cousin arrived and found the trailer in disarray. However, witnesses saw Calhoun at an Alabama convenience store at approximately 6 a.m. on December 17, and one of them testified that Calhoun was driving a car that matched the description of the victim's vehicle. Accordingly, even if trial counsel had presented expert testimony challenging the State's handling of the SD card, there is no reasonable probability of a different verdict. Therefore, Calhoun has not established prejudice. *See Henry*, 948 So. 2d at 621 (quoting *Strickland*, 466 U.S. at 694).

### (3) Trial Witnesses

Calhoun next argues that trial counsel was ineffective for failing to subject the State's case to adversarial testing through investigation, cross-examination,

- 20 -

impeachment, and proper objections in connection with counsel's handling of twelve trial witnesses. More specifically, Calhoun argues that trial counsel failed to object to the improper testimony of Charles Howe, Dr. Jeffery Swindle, and Dick Mowbry; failed to investigate, cross-examine, or impeach Brandon Brown, Sherry Bradley, Darren Batchelor, Brittany Mixon, Tiffany Brooks, Glenda Brooks, Jennifer Roeder, Lieutenant Michael Raley, and Harvey Glen Bush; and elicited harmful evidence from Glenda Brooks and Lieutenant Michael Raley during the defense case. As explained below, we affirm the circuit court's denial of relief as to each claim.

### Charles Howe and Dr. Jeffery Swindle

Calhoun argues that trial counsel was ineffective for failing to object to the State's introduction of the victim's employment application through Charles Howe, the victim's employer, and to Howe's testimony identifying the victim's signature, including that the victim included hearts as part of her signature. Calhoun contends that this evidence constitutes victim impact evidence improperly presented during the guilt-phase of his trial. For the same reason, Calhoun also contends that trial counsel was ineffective for failing to object to the State's introduction of evidence of the victim's signature and dental records reflecting her signature through the victim's dentist, Dr. Jeffery Swindle, who provided the dental records of the victim that the medical examiner used to identify the victim's

body.  We disagree that this evidence is victim impact evidence, which shows "the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death."  § 921.141(8), Fla. Stat. (2018).  Accordingly, trial counsel was not deficient for failing to raise a meritless objection.  *See Peterson v. State*, 154 So. 3d 275, 280 (Fla. 2014) ("[C]ounsel cannot be deemed ineffective for failing to make a meritless argument.").

**Dick Mowbry**

Calhoun next argues that trial counsel was ineffective for failing to object when Dick Mowbry, who found the victim's burned car and body, testified at trial that he saw a charred rib cage in the trunk of the victim's car.  Competent, substantial evidence supports the circuit court's ruling that trial counsel made a strategic decision not to object because an objection would draw more attention to Mowbry's testimony about the rib cage and the crime scene photographs depicting it.  *See Schoenwetter v. State*, 46 So. 3d 535, 554 (Fla. 2010) ("Reasonable decisions regarding trial strategy, made after deliberation by a claimant's trial attorneys in which available alternatives have been considered and rejected, do not constitute deficient performance under *Strickland*.").

Furthermore, there is no prejudice.  Mowbry's testimony about the rib cage occurs on two pages of Mowbry's fifteen-page direct testimony in a guilt phase that spanned five days.  It was not a feature of the State's case, and the most

prejudicial comment by Mowbry—that the rib cage was "a charred, bad sight"—was an unresponsive answer to the State's question, "A human rib cage?," after which point the State briefly addressed a new picture in which Mowbry identified the rib cage before moving on to another line of questioning. In light of the overwhelming evidence of Calhoun's guilt, there is no reasonable probability that the verdict would have been different had trial counsel objected to Mowbry's testimony about the rib cage. Thus, Calhoun has not established prejudice. *See Henry*, 948 So. 2d at 621 (quoting *Strickland*, 466 U.S. at 694).

### Brandon Brown

Calhoun next argues that trial counsel was ineffective for failing to investigate the victim's husband, Brandon Brown, and for failing to raise suspicions regarding problems in the victim's marriage, including evidence that might suggest that Brown had injured the victim on a prior occasion, as well as inconsistencies in Brown's statements to law enforcement regarding the timing of calls he made when his wife did not come home and why he could not go search for her. We disagree. Although trial counsel testified at the evidentiary hearing that she recognized there were suspicions surrounding Brown, competent, substantial evidence supports the circuit court's finding that trial counsel made a strategic decision not to attack a grieving husband, including her concern about losing the jury's trust when Calhoun was insistent that Doug Mixon, not Brown,

was responsible for the victim's death, and when the defense strategy was to blame Mixon. Trial counsel's reasonable strategy does not constitute deficient performance. *See Schoenwetter*, 46 So. 3d at 554.

Moreover, there is no prejudice. In light of the overwhelming evidence of Calhoun's guilt, and the lack of any evidence that Brown was involved in his wife's kidnapping or murder, there is no reasonable probability that any suspicions trial counsel could have raised about the victim's husband or the state of the victim's marriage would have resulted in a different outcome. *See Henry*, 948 So. 2d at 621 (quoting *Strickland*, 466 U.S. at 694).

**Sherry Bradley**

Calhoun next argues that trial counsel was ineffective for failing to impeach Sherry Bradley, one of the witnesses who placed Calhoun in an Alabama convenience store on December 17, 2010, the morning after the victim disappeared. At trial, Bradley testified that she had not seen or heard any news reports between the time she saw the missing persons flyer and recognized Calhoun as the person who had been in her store and the time she reported this information to law enforcement. However, in a pretrial statement, Bradley told law enforcement that she was hesitant to identify the specific type of car she saw Calhoun drive to her store because she was concerned that she might have read that information in the paper. We agree with the circuit court that because Bradley did

not testify at the postconviction evidentiary hearing, what Bradley would have said if questioned about her prior statement about reading the paper is speculative and, thus, cannot support postconviction relief. *Jones v. State*, 845 So. 2d 55, 64 (Fla. 2003) ("Postconviction relief cannot be based on speculative assertions.").

However, even if the jury had heard Bradley's prior statement, there is no reasonable probability of a different outcome. In the context of her entire statement and trial testimony, it is clear that Bradley was hesitant to name the make and model of the car that she saw Calhoun driving on December 17 for fear of having read that information, not that Bradley had difficulty remembering seeing Calhoun at the store or recalling the general description of the car he was driving. At trial, the State did not ask Bradley to testify to the specific make and model of the car, but instead asked Bradley what she remembered about the car she saw Calhoun driving, and Bradley testified that it was "a white car, four door" with a Florida license plate that "looked like [her] mom's car when she's on dirt roads." Moreover, the jury was aware that the flyer, which included Calhoun's picture and a description of the victim's car, was what prompted Bradley to contact law enforcement, and trial counsel attacked Bradley's identification as being based on information from the flyer rather than on her independent recollection. However, the jury also heard Bradley testify to details that could not have come from the flyer or news reports, such as the scratches and dried blood Bradley saw on

- 25 -

Calhoun's hands. Accordingly, there is no reasonable probability that, but for trial counsel's failure to impeach Bradley with her prior statement about reading the paper, the jury's verdict would have been different. Thus, Calhoun has not established prejudice. *See Henry*, 948 So. 2d at 621 (quoting *Strickland*, 466 U.S. at 694).

**Darren Batchelor**

Calhoun next argues that trial counsel was ineffective for failing to impeach Darren Batchelor—whose testimony the State used to corroborate Sherry Bradley's identification of Calhoun as the person in the convenience store on December 17, 2010—with a statement Batchelor made when he identified Calhoun from a photo lineup. Specifically, Batchelor stated that, while he knew Calhoun from school and believed that Calhoun was the person he saw in the store, he could not be one hundred percent certain. Calhoun further contends that trial counsel was ineffective for failing to cross-examine Batchelor as to how he could have known Calhoun from school given their twelve-year age difference. As Batchelor did not testify at the postconviction evidentiary hearing, we agree with the circuit court that Calhoun's claims are too speculative to support postconviction relief given the absence of any evidence as to how Batchelor would have answered the questions that Calhoun claims trial counsel should have asked him. *See Jones*, 845 So. 2d at 64.

However, even if trial counsel could have used these questions to cast doubt on Batchelor's identification of Calhoun, there is no reasonable probability of a different outcome in light of the overwhelming evidence of Calhoun's guilt, particularly where Batchelor's identification is cumulative to Bradley's identification of Calhoun as the person with scratches and dried blood on his hands who drove up to the convenience store in a car that matched the description of the victim's vehicle. Thus, Calhoun has not established prejudice. *See Henry*, 948 So. 2d at 621 (quoting *Strickland*, 466 U.S. at 694).

**Brittany Mixon**

Calhoun next argues that trial counsel was ineffective for failing to cross-examine Brittany Mixon, Calhoun's former girlfriend and the victim's friend, regarding phone records that Calhoun argues establish Brittany did not attempt to contact the victim after learning that the victim and Calhoun were missing. He claims that eliciting this additional testimony would have allowed trial counsel to show that Brittany planted or tampered with evidence when she entered Calhoun's trailer on December 17, 2010, and that her motive to do so was to cover for her father, Doug Mixon, or possibly herself. We disagree.

Brittany did not testify at the postconviction evidentiary hearing, and Calhoun's claim is based on mere speculation that confronting Brittany with the phone records would have created the impression that Brittany was somehow

involved in the victim's murder or its coverup. Moreover, despite what Calhoun argues the phone records show, at trial, the jury heard testimony from Lieutenant Raley that, while he was at Charlie's Deli, where the victim had worked, interviewing the victim's family, the phone rang and the caller ID reflected a call from Brittany's grandparents' telephone number that went unanswered. Raley further testified that, when he called the number on the caller ID, Brittany answered and he spoke to her. Thus, it is not clear how, even if trial counsel had cross-examined Brittany about phone records purporting to show that Brittany failed to inquire about the victim, this would have cast suspicion on Brittany in light of Raley's testimony that Brittany did, in fact, inquire.

Furthermore, although Calhoun argues that the phone records indicate that Brittany planted evidence to cover up her or her father's involvement in the victim's murder, it is not clear how. Calhoun presented no evidence during the postconviction evidentiary hearing supporting this claim. In contrast, the evidence at trial established that the witnesses who saw Brittany enter and exit Calhoun's trailer on December 17, 2010, said that Brittany did not take anything inside with her. The evidence at trial also showed that the items Brittany removed from the trailer (including the victim's purse) were turned over to law enforcement. Calhoun's claim is, thus, too speculative to support postconviction relief. *See Connor v. State*, 979 So. 2d 852, 863 (Fla. 2007) ("Relief on ineffective assistance

of counsel claims must be based on more than speculation and conjecture.").

Accordingly, we affirm the postconviction court's denial of this claim.

**Tiffany and Glenda Brooks**

Calhoun next challenges trial counsel's handling of trial witness Tiffany Brooks, who found Calhoun wrapped in sleeping bags and lying on the ground in her family's shed on the morning of December 18, 2010, and invited Calhoun, who was known to the Brooks family, inside her family's home where he ate, showered, changed and washed his clothes, and napped. Calhoun also challenges trial counsel's handling of Tiffany's mother, Glenda Brooks, who testified during the State's case-in-chief and during the defense case. Regarding trial counsel's performance as to these witnesses during the State's case, Calhoun argues that trial counsel was ineffective for failing to raise a hearsay objection to testimony from Tiffany and Glenda that Tiffany's boyfriend, Steven Bledsoe, called to tell them that he had seen Calhoun pictured on a missing persons flyer with a girl. Calhoun argues that trial counsel's failure to object on the ground that Bledsoe's statement was hearsay improperly allowed the State to introduce testimony from both Tiffany and Glenda that, upon being informed about the missing persons flyer, Calhoun said that he did not know the victim.

We affirm the circuit court's denial because Bledsoe's out of court statement is not hearsay, as it was not offered to prove the truth of the matter asserted. *See* §

90.801(1)(c), Fla. Stat. (2019) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Rather, it was offered to establish the effect of the missing persons flyer on the Brooks family and lay the foundation for Calhoun's admissible statement about not knowing the girl on the flyer. *See* § 90.804(1)(c), Fla. Stat. (2019) (excepting admissions against interest from the hearsay exclusionary rule); § 90.804(18)(a) (excepting statements of a party opponent from the hearsay exclusionary rule). Accordingly, trial counsel was not ineffective for failing to raise a meritless objection. *See Peterson*, 154 So. 3d at 280.

Regarding trial counsel's handling of Glenda Brooks during the defense case, Calhoun argues that trial counsel was ineffective in eliciting that Glenda became uncomfortable with Calhoun's being in her house after learning that he was pictured on a missing persons flyer with the victim and asked him to leave. Because Calhoun cannot demonstrate prejudice, it is unnecessary to address whether trial counsel's performance was deficient. In light of the overwhelming evidence of Calhoun's guilt, there is no reasonable probability the verdict would have been different had trial counsel not elicited testimony about Glenda's comfort level with Calhoun, particularly where—even without Glenda's testimony—the

reasonable inference was that the situation was uncomfortable for the Brooks family.  *See Henry*, 948 So. 2d at 621 (quoting *Strickland*, 466 U.S. at 694).

**Jennifer Roeder**

Calhoun next argues that trial counsel was ineffective in her cross-examination of the State's digital evidence crime analyst, Jennifer Roeder, for (1) failing to elicit testimony from Roeder regarding the amount of force required to remove an SD card from a camera; (2) for not using Roeder to imply that the SD card's presence in the trailer was suspicious; and (3) for failing to elicit testimony from Roeder that Lieutenant Raley had compromised the reliability of the SD card by accessing it without the proper forensic software.  We affirm the circuit court's denial because trial counsel's performance was not deficient and, in any event, there is no prejudice.

First, trial counsel's testimony that she tries not to assume her jurors are stupid by using experts to elicit information that is common knowledge, such as how to remove an SD card from a camera, is not an objectively unreasonable strategy.  *See Schoenwetter*, 46 So. 3d at 554 (explaining that trial counsel is not deficient for making reasonable decisions regarding trial strategy).

Second, trial counsel was not deficient for failing to elicit Roeder's testimony regarding how the SD card came to be in the trailer, as that was not within Roeder's personal knowledge.  Moreover, any testimony by Roeder

- 31 -

acknowledging that an SD card is easy to conceal and transport would have been cumulative because trial counsel used testimony regarding Brittany Mixon's entering the trailer twice after the victim and Calhoun went missing to argue that certain evidence had been moved and other evidence could have been planted. *See Bright*, 200 So. 3d at 737 (explaining that trial counsel is not deficient for failing to present cumulative evidence).

Third, trial counsel was not ineffective for failing to elicit from Roeder evidence cumulative to that which was already before the jury, *see id.*, namely that Lieutenant Raley had accessed the SD card before sending it to the Florida Department of Law Enforcement for analysis, and that the accuracy of the State's calculation of the date and time of the photograph of Calhoun's ceiling depended upon no one having reset the date and time on the camera.

Accordingly, trial counsel was not deficient in her handling of Roeder.

Moreover, as addressed in affirming the denial of Calhoun's claim that trial counsel was ineffective for failing to use a digital forensic expert, Calhoun cannot establish prejudice. The State's calculation from the images on the SD card was cumulative to other evidence establishing the State's timeline, which placed the victim in Calhoun's trailer sometime between 8:40 p.m. on December 16, 2010, and the early morning hours of the following day. Thus, there is no reasonable probability that, but for trial counsel's failure to elicit the testimony in question

from Roeder, the verdict would have been different. *See Henry*, 948 So. 2d at 621 (quoting *Strickland*, 466 U.S. at 694).

**Lieutenant Michael Raley**

Calhoun next argues that trial counsel was ineffective for failing to cross-examine the State's lead investigator, Lieutenant Michael Raley of the Holmes County Sheriff's Office, regarding (1) discrepancies in phone records; (2) differences between the clothing that Calhoun was wearing when Sherry Bradley saw him on December 17, 2010, and the clothing that Calhoun left at the Brooks' residence the next day; and (3) discrepancies between Calhoun's statement about being in the woods with law enforcement in the days leading up to his arrest and Raley's trial testimony regarding Calhoun's statement. Calhoun also argues that trial counsel was ineffective for calling Raley as a defense witness and eliciting damaging testimony connecting the victim's vehicle to a Calhoun family property. We disagree and affirm the circuit court's denials of these claims.

First, regarding the phone records, Calhoun's claim appears to be that trial counsel could have used records that purportedly show no call from Brittany Mixon's grandparents' telephone number to Charlie's Deli in order to attack Raley's credibility. Raley testified at trial that, although the call went unanswered, the caller ID at Charlie's Deli reflected that someone had called from the home of Brittany Mixon's grandparents, and when he returned the call he spoke to Brittany

- 33 -

Mixon. Calhoun's claim is speculative in that he failed to present evidence that the phone records would reflect an unanswered call. *See Connor*, 979 So. 2d at 863 (explaining that postconviction claims based on mere speculation and conjecture do not warrant relief). Moreover, there is no prejudice. In light of the overwhelming evidence of Calhoun's guilt, there is no reasonable probability that trial counsel's questioning Raley about the phone records would have resulted in a different verdict. *See Henry*, 948 So. 2d at 621 (quoting *Strickland*, 466 U.S. at 694).

Second, regarding Calhoun's clothing, Calhoun's claim is speculative in that it assumes he was wearing the same clothing on Friday, December 17, 2010, when Sherry Bradley saw him at the Alabama convenience store, that he wore the next day, Saturday, December 18, when Tiffany Brooks found him wrapped in sleeping bags and lying on the ground in her family's shed. But, in any event, there is no prejudice because Bradley's identification of Calhoun was not based on the clothing he wore, but on the fact that Calhoun had been in Bradley's store on prior occasions, as well as Bradley's description of the injuries to Calhoun's hands and the fact that she saw Calhoun driving a car matching the description of the victim's car. Thus, even if trial counsel had been able to use Raley to establish that the shirt recovered from the Brooks' dryer was a different shirt than Bradley had described, in light of the overwhelming evidence of Calhoun's guilt, there is no reasonable

probability of a different outcome. *See Henry*, 948 So. 2d at 621 (quoting *Strickland*, 466 U.S. at 694).

Third, regarding Raley's testimony concerning Calhoun's post-arrest statements about being in the woods with law enforcement, trial counsel's performance was not deficient because Raley's testimony was not misleading. Raley accurately testified at trial that, following Calhoun's arrest on December 20, 2010, Calhoun admitted that he had been in the woods with law enforcement in the days leading up to his arrest. Although the State did not ask Raley about the date and location that Calhoun had said this occurred, even if trial counsel had clarified that the statement pertained to December 19, near Bethlehem Campground in Florida, Raley's testimony at the postconviction evidentiary hearing establishes that the State would have been able to present evidence that the only searches in the woods occurred in Alabama. Moreover, there is no prejudice because other evidence established that Calhoun was in the woods in Alabama near where the victim's body and car were burned, including evidence that the Brooks residence, where Calhoun was found wrapped in sleeping bags and lying on the ground in a shed early in the morning of Saturday, December 18, is only 1.5 miles away. Thus, Calhoun has not established prejudice, namely a reasonable probability that he would have received a different verdict but for trial counsel's alleged deficiency. *See Henry*, 948 So. 2d at 621 (quoting *Strickland*, 466 U.S. at 694).

Finally, regarding trial counsel's handling of Raley as a defense witness, as the circuit court found, trial counsel's eliciting testimony from Raley about finding items that were possibly from the victim's vehicle at a Calhoun family property was part of her strategy to show that the evidence against Calhoun looked too made up and must have been planted. *See Schoenwetter*, 46 So. 3d at 554 (explaining that trial counsel is not deficient for making reasonable decisions regarding trial strategy). But, in any event, Calhoun cannot establish prejudice. The evidence of Calhoun's guilt is overwhelming, and there is no reasonable probability that the jury would have reached a different verdict had trial counsel not elicited testimony from Raley regarding evidence that the State conceded it could not conclusively prove came from the victim's vehicle. *See Henry*, 948 So. 2d at 621 (quoting *Strickland*, 466 U.S. at 694).

### Harvey Glen Bush

In his final ineffective assistance of counsel claim, Calhoun argues that trial counsel was ineffective for failing to elicit testimony from Harvey Glen Bush that Charlie's Deli, where the victim worked, was closed by 7 p.m. on December 16, 2010, the evening that the victim disappeared. This claim is too speculative to support postconviction relief because there is no evidence of how the store's closing earlier than usual on the day the victim disappeared is related to the victim's kidnapping and murder. *See Connor*, 979 So. 2d at 863 (explaining that

claims based on speculation and conjecture do not establish ineffective assistance of counsel).

But, in any event, there is no prejudice as a result of trial counsel's alleged deficiency in failing to elicit this information from Bush. Regardless of what time Charlie's Deli closed or what the victim did between when the store closed and when she went to pick up Calhoun, the victim was last seen alive by Jerry Gammons, whose trailer was one road over from Calhoun's trailer, at approximately 8:40 p.m. on December 16, when the victim drove up to Gammons' trailer in her car and asked for Calhoun. There is no evidence that the victim was in distress when she arrived at Gammons' trailer looking for Calhoun. Rather, the evidence establishes that the victim was kidnapped and murdered after she left work at Charlie's Deli, and more specifically, after she stopped at Gammons' looking for Calhoun. Accordingly, Calhoun has not established prejudice because there is no reasonable probability that testimony from Bush that Charlie's Deli was closed by 7 p.m. on December 16 would have resulted in a different verdict. *See Henry*, 948 So. 2d at 621 (quoting *Strickland*, 466 U.S. at 694).

## C. Other Claims

Calhoun raises five other claims in his postconviction appeal, namely that (1) trial counsel's conflict of interest denied him effective assistance of counsel; (2) the State violated *Brady v. Maryland*, 373 U.S. 83 (1963); (3) the State violated

*Giglio v. United States*, 405 U.S. 150 (1972); (4) the circuit court abused its discretion in denying Calhoun's motions to amend and to reopen the evidentiary hearing; and (5) the circuit court denied Calhoun due process by using portions of the State's written arguments in its order denying postconviction relief. As explained below, none of these claims warrants relief.

### (1) Conflict of Interest

First, Calhoun argues that the circuit court erred in denying his claim that his trial counsel's conflict of interest denied him effective assistance of counsel. We disagree and affirm.

"Claims of an attorney's conflict of interest are a subset of ineffective assistance of counsel claims under *Strickland* because the [Sixth Amendment] right to effective assistance of counsel encompasses the right to representation free from actual conflict." *State v. Dougan*, 202 So. 3d 363, 384 (Fla. 2016). The "standard of review [that] applies to *Strickland* claims based upon an alleged conflict of counsel" is derived from the United States Supreme Court's decision in *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980), which this Court has explained as follows:

> [I]n order to establish an ineffectiveness claim premised on an alleged conflict of interest the defendant must "establish that an actual conflict of interest adversely affected his lawyer's performance." A lawyer suffers from an actual conflict of interest when he or she "actively represent[s] conflicting interests." To demonstrate an actual conflict, the defendant must identify specific evidence in the record that suggests that his or her interests were compromised. A possible,

speculative or merely hypothetical conflict is "insufficient to impugn
a criminal conviction."

*Dougan*, 202 So. 3d at 384 (quoting *Hunter v. State*, 817 So. 2d 786, 791-92 (Fla.

2002) (quoting *Cuyler*, 446 U.S. at 350))).

"The question of whether a defendant's counsel labored under an actual

conflict of interest that adversely affected counsel's performance is a mixed

question of law and fact." *Id.* However, unlike a "standard Sixth Amendment

claim[] of ineffective assistance of counsel"—which requires proving both

deficient performance *and* prejudice under *Strickland*'s reasonable probability

standard—"[o]nce a defendant satisfies the *Cuyler* test [by proving an actual

conflict exists], prejudice is presumed and the defendant is entitled to relief." *Id.*

(citing *Strickland*, 466 U.S. at 692; *Cuyler*, 446 U.S. at 349-50).

At trial, Calhoun was represented by the Public Defender's Office for the

Fourteenth Judicial Circuit. Calhoun argues that the entire office was precluded

from representing him because one attorney in the office—who never represented

Calhoun or had any involvement in or information pertinent to his case—was not

assigned to represent Calhoun because the attorney knew the victim and her

family. We disagree because, on the facts of this case, it is clear that any conflict

that precluded this attorney from representing Calhoun was based on a "personal

interest" that did "not present a significant risk of materially limiting the

representation of [Calhoun] by the remaining lawyers in the [public defender's office]." R. Regulating Fla. Bar 4-1.10(a). The record indicates that the attorney in question did not have a close connection to the victim and her family, but that he knew them from the community and, therefore, was not assigned to the case to avoid any appearance of impropriety. Moreover, there is no evidence that the two assistant public defenders who represented Calhoun knew the victim or her family or that they limited their representation of Calhoun because their colleague did. Thus, Calhoun has not established an actual conflict precluding his representation by the public defender's office, including the two attorneys from the office who represented him.

Calhoun also argues that the unavailability of the attorney in question denied Calhoun representation by two attorneys who met the minimum standards for attorneys in capital cases set forth in Florida Rule of Criminal Procedure 3.112. However, "[c]riminal defendants do not have the right to appointed counsel of their choice," *Jones v. State*, 74 So. 3d 149, 151 (Fla. 2d DCA 2011), and this Court's precedent is clear that an attorney's lack of qualification under rule 3.112 "does not amount to per se ineffective assistance of counsel." *Cox v. State*, 966 So. 2d 337, 358 n.10 (Fla. 2007); *see also* Fla. R. Crim. P. 3.112 cmt. (explaining that rule 3.112's "standards are not intended to establish any independent legal rights" and

that "[a]ny claims of ineffective assistance of counsel will be controlled by *Strickland*").

Accordingly, we affirm the circuit court's denial of relief.

**(2) *Brady***

Second, Calhoun claims that the State violated *Brady* by failing to disclose information that Natasha Simmons allegedly provided to the then-sheriff of Geneva County, Alabama, Greg Ward, before Calhoun's trial concerning a suspicious encounter with Doug Mixon around the time of the victim's disappearance. Because the circuit court's finding that the State did not suppress favorable evidence is supported by competent, substantial evidence that Simmons did not provide this information to law enforcement, we hold that Calhoun has failed to establish the second—suppression—prong of *Brady*. *See Conahan v. State*, 118 So. 3d 718, 729 (Fla. 2013) ("[T]o establish a *Brady* violation, three elements must be shown: (1) the evidence at issue was favorable to the defendant, either because it is exculpatory or is impeaching; (2) the evidence was suppressed, willfully or inadvertently, by the State; and (3) because the evidence was material, its suppression resulted in prejudice."); *cf. Hitchcock v. State*, 991 So. 2d 337, 352 (Fla. 2008) ("agree[ing] that the State could not suppress [evidence] that did not

yet exist at the time of trial"). Accordingly, we affirm the circuit court's denial of relief as to this claim.[4]

### (3) *Giglio*

Third, Calhoun argues that the State violated *Giglio* by knowingly presenting the false trial testimony of Lieutenant Raley concerning statements that Calhoun made regarding his whereabouts while law enforcement was searching the woods. He also argues that the State presented false and misleading closing arguments on this issue that could have wrongly led Calhoun's jury to believe that Calhoun placed himself in the woods with law enforcement on December 17, 2010, near where the victim's car and body were burned and, by doing so, effectively confessed to the victim's murder. We affirm the circuit court's denial of this claim.

---

4. Although Calhoun labels this claim as a *Brady* claim, he includes the alternative argument that if Simmons's testimony that she informed Ward of her suspicious encounter with Doug Mixon is neither newly discovered evidence nor *Brady* material, then trial counsel was ineffective for failing to discover it. Calhoun is not entitled to relief on this ground either. Trial counsel cannot be ineffective for failing to discover that Simmons provided information to Ward where competent, substantial evidence supports the circuit court's finding that Simmons did not actually provide the information to Ward. *Cf. Holland v. State*, 916 So. 2d 750, 757 (Fla. 2005) ("[C]ounsel cannot be deemed deficient for failing to investigate or present mitigation evidence unless the defendant establishes that mitigation exists."). Moreover, there is no allegation or evidence explaining how, apart from Simmons's alleged statement to Ward, trial counsel should have learned of Simmons's existence, let alone of Simmons's account about her encounter with Doug Mixon. Thus, we affirm the circuit court's denial of relief on this alternative ground.

Calhoun's claim is procedurally barred because it is based on information—Calhoun's statement to law enforcement and the associated trial testimony and closing argument—that was available to Calhoun and his counsel at trial. *See Jimenez v. State*, 265 So. 3d 462, 479 (Fla. 2018) ("[A] *Giglio* claim based on information that the defendant and defense counsel had at the time of trial is barred.") (internal quotation marks and citation omitted); *see also id.* at 480 ("[A]s with the other due-process-based claims (i.e., *Brady* and *Giglio*), a defendant who knows that his jury is being misled cannot adopt an 'I'll deal with it later' approach.").

Even without the procedural bar, Calhoun would not be entitled to relief. The State did not violate *Giglio* because, as explained above, Lieutenant Raley's trial testimony was not false.[5] *See Whitton v. State*, 161 So. 3d 314, 322 (Fla. 2014) ("[T]here are three elements to a successful *Giglio* claim, [namely] that (1) the [trial] testimony was false; (2) the prosecutor knew it was false; and (3) the testimony was material."); *see also id.* ("If [the defendant] successfully demonstrates the first two elements [that the State knowingly presented false trial testimony], the State bears the burden of proving that the testimony was not material by showing that there is no reasonable possibility that it could have

_____

5. Because there was no false testimony to correct, Calhoun's argument that the State violated *Napue v. Illinois*, 360 U.S. 264, 269 (1959), by allowing false testimony to go uncorrected also fails.

affected the verdict because it was harmless beyond a reasonable doubt.") (internal quotation marks and citation omitted).

Although there can be no violation of *Giglio* without false *trial testimony*, *see Jimenez*, 265 So. 3d at 485, the State may implicate the due-process protection against misleading the jury through improper closing arguments. However, that did not occur in this case. Rather, the prosecutor argued that when Calhoun's statement to Lieutenant Raley that he had been in the woods with law enforcement in the days leading up to his arrest on December 20, 2010, was viewed in light of the evidence presented at trial, the jury could infer that this must have occurred on the afternoon of December 17 when Lieutenant Raley visited Calhoun's campsite, which the jury heard was approximately 1,488 feet from where the victim's car and body were eventually found and approximately 1.5 miles from the Brooks' residence where Calhoun was found early the next morning, December 18. It is not impermissible for the prosecutor to suggest during closing argument reasonable inferences that the jury may draw from the evidence. *See Fleurimond v. State*, 10 So. 3d 1140, 1148 (Fla. 3d DCA 2009) ("The purpose of closing argument is to present a review of the evidence and suggestions for drawing reasonable inferences from the evidence.").[6]

_____

6. Other evidence in the record underscores that the State's argument was not misleading. For example, during the postconviction evidentiary hearing, Lieutenant Raley testified that, although Calhoun had said that law enforcement

Accordingly, we affirm the circuit court's denial of relief on this claim.[7]

## (4) Denial of Motions to Amend and Reopen the Evidentiary Hearing

Fourth, Calhoun argues that the circuit court abused its discretion in denying his motions to amend his postconviction motion a fifth and sixth time to add claims of newly discovered evidence from Robert Vermillion and Keith Ellis concerning

was close to him on the night of December 19, 2010, near Bethlehem Campground in Florida, law enforcement had only searched the woods in Alabama. Also, although this information was not admitted at trial, in another portion of his statement, Calhoun placed himself in the woods in Alabama near where law enforcement was searching on December 17, 2010. Specifically, Calhoun told law enforcement that he was running and hiding in the woods after escaping from an unknown kidnapper and that, while he was in the woods in Alabama on Friday, December 17, he thought he could hear police radios in the distance.

7. In his reply brief, Calhoun also argues that the State violated *Giglio* by presenting the false trial testimony of Sherry Bradley—the manager of the Alabama convenience store who identified Calhoun as having been in the store on the morning of December 17, 2010, scratched and bloody and driving a car that matched the description of the victim's vehicle. Calhoun bases his argument on Bradley's trial testimony that she had not seen or read any news reports before identifying Calhoun, although Bradley indicated in pretrial statement that she was reluctant to identify the specific make and model of the car she saw for fear of having read it in the paper. Although Calhoun raised this argument in his postconviction motion, because he did not raise it in his initial brief, he waived it. *See State v. Dougan*, 202 So. 3d 363, 378 (Fla. 2016).

But, even without the waiver, Calhoun would not be entitled to relief. First, the claim is procedurally barred because it is based on information that was available to Calhoun and his counsel at trial. On the merits, there is no reasonable possibility that Bradley's trial testimony regarding not having read the newspaper affected the verdict. Bradley's pretrial statement about reading the news related only to her reluctance to name the specific make and model of the vehicle that she saw Calhoun driving, for fear that she had read about it, not to her ability to generally describe the vehicle she saw on December 17 or to identify Calhoun as its driver.

Doug Mixon's alleged involvement in the victim's murder. Calhoun also argues that the trial court abused its discretion in denying his motion to reopen the evidentiary hearing to address the claim regarding Ellis. We disagree.

Neither of Calhoun's motions to amend were filed at least 45 days before the evidentiary hearing as required by Florida Rule of Criminal Procedure 3.851(f)(4): the motion regarding Vermillion was filed 14 days before the evidentiary hearing, and the motion regarding Ellis was filed over a month after the hearing. Nevertheless, the circuit court gave Calhoun the benefit of his proposed amendment regarding Vermillion by allowing Calhoun to present Vermillion's testimony at the evidentiary hearing and by considering it in the order denying postconviction relief. Although Calhoun's claim regarding Doug Mixon's alleged confession to Ellis has not yet been considered, it will be considered in the successive postconviction motion that is currently pending in the circuit court that—per Calhoun's request—this Court stayed pending disposition of this appeal. On these facts, we find no abuse of discretion. *Cf. Smith v. State*, 213 So. 3d 722, 735-36 (Fla. 2017) (recognizing that rule 3.851 imposes a time limitation for filing motions to amend and holding that the circuit court did not abuse its discretion in denying a noncompliant motion).

## (5) Circuit Court's Use of State's Written Arguments

In the fifth and final claim of his postconviction appeal, Calhoun argues that the circuit court violated his right to due process by using portions of the State's written arguments in its order denying relief as to Calhoun's guilt-phase claims. We disagree. As explained above, the circuit court's conclusions are supported by the record, and when tested under the proper standard of review are due to be affirmed. That the circuit court's order incorporates arguments by the State on issues of which Calhoun had notice and the opportunity to address in his own filings does not deny Calhoun due process. *See Pietri v. State*, 885 So. 2d 245, 270 (Fla. 2004) (explaining that this Court has consistently rejected the due-process-based argument that a circuit court "abdicate[s] any responsibility for independently making findings of fact and conclusions of law" by "adopting the State's post-evidentiary hearing memorandum," so long as the defendant had notice and an opportunity to submit his or her own filing or object to the State's).

## III. HABEAS PETITION

In his habeas petition, Calhoun argues that appellate counsel was ineffective on direct appeal for (1) failing to challenge the exclusion of Calhoun's statement related to when and where he was in the woods with law enforcement in the days leading up to his arrest; (2) failing to challenge the venue and jurisdiction jury

instructions; and (3) failing to argue that the improper introduction of victim impact evidence during the guilt phase constituted fundamental error.

While ineffective assistance of appellate counsel claims are proper in a petition for a writ of habeas corpus, *see Abdool v. State*, 220 So. 3d 1106, 1115 (Fla. 2017), all three of Calhoun's habeas claims are procedurally barred permutations of claims that Calhoun raised in his postconviction motion.[8] Thus, Calhoun cannot relitigate the substance of these claims in his habeas petition under the guise of ineffective assistance of appellate counsel. *See Knight v. State*, 923 So. 2d 387, 395 (Fla. 2005) ("[C]laims [that] were raised in [a] postconviction motion . . . cannot be relitigated in a habeas petition.").

Even without the procedural bar, however, Calhoun would not be entitled to relief on the merits. This Court has explained the applicable standard of review as follows:

> "The standard of review for ineffective appellate counsel claims mirrors the *Strickland* standard for ineffective assistance of trial counsel." [*Wickham v. State*, 124 So. 3d 841, 863 (Fla. 2013)].

---

8. As explained above, Calhoun's challenges to the State's use of his statement regarding being in the woods with law enforcement form the basis of his *Giglio* claim and his claim that trial counsel was ineffective in cross-examining Lieutenant Raley regarding Calhoun's statement. Similarly, Calhoun's allegation that the State improperly introduced victim impact evidence during the guilt phase forms the basis of his claim that trial counsel was ineffective in failing to object to the introduction of this evidence through the victim's employer and dentist. Finally, although Calhoun did not appeal it, the circuit court denied his postconviction claim that trial counsel was ineffective with respect to the venue and jurisdiction jury instructions.

Specifically, to be entitled to habeas relief on the basis of ineffective assistance of appellate counsel, the defendant must establish

> [first, that] the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, [that] the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.

*Bradley v. State*, 33 So. 3d 664, 684 (Fla. 2010) (quoting *Pope v. Wainwright*, 496 So. 2d 798, 800 (Fla. 1986)). Further, "appellate counsel cannot be deemed ineffective for failing to raise nonmeritorious claims." *Valle v. Moore*, 837 So. 2d 905, 908 (Fla. 2002).

*England v. State*, 151 So. 3d 1132, 1140 (Fla. 2014).

In his first habeas claim, Calhoun argues that appellate counsel was ineffective for failing to challenge, as part of the rule of completeness argument that Calhoun raised on direct appeal, that the exclusion of Calhoun's statement regarding when and where he was in the woods with law enforcement was error. As this Court held on direct appeal, because trial counsel failed to proffer the portions of the statement that she argued should have been admitted under the rule of completeness, the issue was not preserved for appeal. *Calhoun*, 138 So. 3d at 360. However, even if appellate counsel had raised this argument on direct appeal, counsel could not have met the heavy burden to demonstrate fundamental error. "Fundamental error is 'defined as error that reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained

- 49 -

without the assistance of the alleged error.' " *Id.* (quoting *Anderson v. State*, 841 So. 2d 390, 403 (Fla. 2003)). The evidence presented at trial overwhelmingly showed that, after the victim disappeared, but prior to December 19, Calhoun was, in fact, in the woods in Alabama near where the victim's burned car and body were later found. Thus, appellate counsel cannot be ineffective for failing to raise this meritless claim. *See Valle*, 837 So. 2d at 908.

Calhoun's second habeas claim, that appellate counsel was ineffective for failing to challenge the venue and jurisdiction jury instructions, is similarly without merit and, therefore, appellate counsel was not ineffective for failing to raise it. More specifically, because trial counsel agreed to the venue instruction, any error would have been invited and, thus, waived. *See Lane v. State*, 388 So. 2d 1022, 1026 (Fla. 1980) ("Venue . . . is merely a privilege which may be waived or changed.") Although jurisdiction is "the very power of the state to exert the influence of its courts over a criminal defendant[, and] cannot be waived," *id.* at 1026, the instructions that were given to Calhoun's jury did not deprive the State of its burden to establish jurisdiction beyond a reasonable doubt.

Rather, Calhoun's jury was instructed in accordance with this Court's decision in *Lane*, which establishes that for Florida to have territorial jurisdiction to try a defendant for first-degree murder where the victim died in another state, the State must prove beyond a reasonable doubt "*either* that the premeditation to

murder the victim was formulated in the State of Florida *or* that the underlying felony, [in Calhoun's case kidnapping] occurred in the State of Florida."[9] *Id.* at 1028 (emphasis added). Although only one of these findings is required, in Calhoun's case, evidence was presented at trial from which the jury could have found beyond a reasonable doubt *both* that Calhoun kidnapped the victim from his Florida trailer following an altercation with the victim *and* that Calhoun formulated the intent to murder her in Florida when he bound her in the trunk of her own car before driving the victim to the woods near his Alabama campsite to burn her alive. The State of Florida unquestionably had territorial jurisdiction to prosecute Calhoun for the victim's first-degree murder, and the jury instructions in his case did not deprive the State of its burden to establish jurisdiction beyond a reasonable doubt. Thus, appellate counsel cannot be ineffective for failing to raise this meritless claim. *See Valle*, 837 So. 2d at 908.

Finally, Calhoun's third habeas claim, that appellate counsel was ineffective for failing to challenge the improper introduction of victim impact evidence during the guilt phase through the victim's employer and dentist does not warrant relief. As explained above, the challenged evidence—that the victim included hearts in

---

9. The jurisdiction instruction given in Calhoun's case required the State to prove beyond a reasonable doubt either that Calhoun took the victim against her will from Florida (an essential element of the kidnapping underlying felony murder) or that Calhoun formed a premeditated intent to kill the victim in Florida.

- 51 -

her signature and documents reflecting the victim's signature—is not victim impact evidence. Accordingly, appellate counsel cannot be ineffective for failing to raise a meritless fundamental error challenge to its introduction. *See id.*

Therefore, we deny Calhoun's habeas petition.

## IV. CONCLUSION

For the foregoing reasons, we affirm the circuit court's order denying Calhoun relief from his conviction and deny his habeas petition.

It is so ordered.

CANADY, C.J., and POLSTON, LABARGA, LAWSON, LAGOA, and MUÑIZ, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Holmes County,
        Christopher Nida Patterson, Judge - Case No. 302011CF000011CFAXMX
And an Original Proceeding – Habeas Corpus

Robert Friedman, Capital Collateral Regional Counsel, and Stacy R. Biggart and Elizabeth Spiaggi, Assistant Capital Collateral Regional Counsel, Northern Region, Tallahassee, Florida,

        for Appellant/Petitioner

Ashley Moody, Attorney General, and Lisa A. Hopkins, Assistant Attorney General, Tallahassee, Florida,

        for Appellee/Respondent